[No. 44108-6-I. Division One. November 24, 2003.]

THE STATE OF WASHINGTON, *Respondent*, v. JERAMIE MORAN, *Appellant*.

*Dana M. Nelson* (of *Nielsen, Broman & Koch, P.L.L.C.*), for appellant.

*Janice E. Ellis, Prosecuting Attorney*, and *Mary K. Webber, Charles F. Blackman,* and *David F. Thiele, Deputies*, for respondent.

SCHINDLER, J. — Jeramie Moran appeals his conviction of first degree manslaughter while armed with a deadly weapon. He argues his conviction must be reversed because the court gave an erroneous accomplice liability instruction and the error was not harmless, the trial court erred by admitting a letter from Moran to a friend, and prosecutorial misconduct in closing argument deprived him of a fair trial. We disagree and affirm.

## FACTS

On April 7, 1998, Moran[1] left his home and rode the bus to Everett with his friend, Alex. That afternoon, they got together with Moran's friend Stephen Camero. Moran and Camero decided to catch a bus to Lynnwood where Moran's sister lived, because they knew that the sister's friend, Raoul, would buy them alcohol.

---

[1] Moran's date of birth is July 9, 1980.

Moran and Camero ended up near Edmonds Community College, where they ran into Moran's friend, Matt, who was with Tagan Arnold and Danny Garcia. Moran, Camero, Arnold, and Garcia drank wine with Matt. When Matt left for class, the other four decided to get more alcohol from Raoul.

Moran, Garcia, Arnold, and Camero rode another bus to Moran's sister's apartment. Raoul bought them a half gallon of gin. He dropped the four off at Andy's Motel in Edmonds, where Garcia's friend, Brandon Johnson, was living.

When they arrived at the motel room, Johnson's mother, who was in the room with him, told them to leave. They then climbed into a nearby newspaper bin and drank gin for about half an hour. After Johnson's mother left, they returned to the motel room and continued to drink.

About 45 minutes later, Moran asked Johnson to drive him home because he had a 9 P.M. curfew. Johnson agreed, and Moran, Camero, Garcia, and Arnold left in Johnson's Toyota. Johnson drove to an AM/PM store to buy gas. On the way, Arnold asked Moran if he wanted to join the "206." Garcia described the "206" as a group of friends who hung out together or a clique. Even though Moran was reluctant to join the 206 because of the way the group had treated another friend of his, eventually he said he wanted to join. Arnold and Garcia told Moran that, in order to join the 206, Moran would have to be "jumped in," which meant he had to be beaten up.

When the group arrived at the AM/PM store, Johnson pumped gas and Camero stayed in the car. Moran, Arnold, and Garcia went to the side of the store, and Arnold and Garcia proceeded to punch Moran in the head. Moran fell to the ground, and Arnold and Garcia kicked him a few times. After about a minute, Arnold and Garcia stopped and allowed Moran to get up. Garcia claimed he broke his left hand when he hit Moran.

Arnold, Garcia, and Moran returned to Johnson's car. Camero asked if he could also join the 206. Moran tried to

dissuade him. Moran told Johnson to take Camero home and gave him directions. Johnson missed a turn on the way to Camero's house, and parked about a block away from Camero's house, adjacent to a fence and north of a home with a large tree in the front yard. According to Moran, when Johnson pulled over, he said it was a good spot for Camero's "jumping in."

After Johnson stopped the car, all five occupants got out and walked towards the house. According to Moran and Johnson, Garcia suddenly punched Camero in the face, causing him to fall to the ground. Garcia denied hitting Camero, claiming that his hand was broken, swollen, and sore and he could not use it. Garcia said he saw Camero on the ground, but did not know how he got there.

Johnson admitted that he kicked Camero in the head and saw Camero's eyes roll back in his head. According to Moran, Johnson stomped on Camero's head twice. Moran testified that Arnold and Garcia kicked Camero in the torso, but that he did nothing but stand by and watch.

Camero was unconscious. Moran checked Camero's pulse and found that his breathing was "regular and strong."[2] Moran saw no bleeding or injuries. Moran asked the others to take Camero back to the car with them. Johnson told him to leave him where he was. Moran dragged Camero under the large tree in the yard of the house near where the group had parked. He rejoined the rest of the group, and they left in Johnson's car.

Moran, Johnson, Garcia, and Arnold returned to Johnson's motel room to drink alcohol. According to Johnson, while they were drinking, Arnold said he did not want to go back to jail and wanted to return and kill Camero.

The four left the motel again. Johnson drove to a 7-11 store where they stole beer. Then they went to see a man named Penguin about buying marijuana. Because Penguin was unable to locate any marijuana, the four took Penguin

---

[2] Report of Proceedings (RP) (Nov. 16, 1998) at 1240.

back to Johnson's motel room so he could use the phone to try to find some.

After the group returned to the motel room, Johnson's girl friend, Tamara Slattum, and her friend, Michell Lynch, arrived. The group drank beer, and then Johnson, Arnold, and Garcia drove Penguin home. Slattum, Moran, and Lynch followed in Slattum's car. Johnson dropped Penguin off and drove to where Slattum had parked her car. He threw Slattum the key to his motel room and told her to wait there for him, explaining that the group had some business to take care of. Moran got into Johnson's car. The four then drove to where they had left Camero to see if he had regained consciousness and gone home or was still lying under the tree.[3]

Camero was unconscious and in the same place. There are different versions of what happened when they arrived at Camero's location this time.

According to Johnson, he drove the group back to where they had left Camero and parked on the side of the road. He sat in his car and looked out of the side view mirror. Arnold and Moran got out of the car and walked up to where Camero was lying.[4] Johnson saw Arnold stab Camero with a pen he had taken out of the glove compartment. Arnold returned to the car with blood on his hands, carrying the bloody pen. Johnson then heard loud whacking noises and saw Moran hitting Camero with a wooden closet rod from the motel room.[5] Johnson did not recall how many times Moran hit Camero with the rod, nor could he recall anything about where Garcia was or what Garcia was doing while this was happening. His first clear memory of Garcia is of him being back in the car. According to Johnson, Moran returned to the car and threw the closet rod in the back. The

---

[3] According to Johnson and Garcia, the events involving Penguin did not occur until after the group had returned the second time to where Camero was lying. The chronology with respect to this matter is not relevant to the issues presented.

[4] Johnson did not recall what Garcia was doing at this time.

[5] Johnson said he put the rod in his car thinking he could use it to pry open one of his car doors that had been dented and would open only from the inside.

group then drove back to the motel. Johnson denied having any part in Camero's beating with the closet rod.

According to Garcia, Arnold and Moran got out of the car. Garcia stayed in the car for a few minutes and then told Johnson he was going to see what was taking them so long. Garcia testified that Johnson told him to stay where he was and that Johnson got out of the car and walked towards Camero. Garcia got out of the car as well. Garcia heard a loud hitting noise coming from underneath the large tree. He saw someone swinging a stick, but could not tell who it was because it was too dark. As he got closer, Garcia saw Arnold give the stick to Moran. Garcia testified that Moran hit Camero with the stick on his head and chest between 10 and 15 times. While Moran was beating Camero, Arnold, Johnson, and Garcia returned to the car. Finally, Moran returned to the car and told the group that Camero was still breathing. The group left and drove back to the motel.

According to Moran, when they arrived, all four of them got out of the car. Moran walked to Camero and saw Arnold hunched over him. Arnold held out his hand and Moran saw that it was bloody and that Arnold was carrying a pen. Moran testified that Arnold said "this is what this 206 is about."[6] Arnold left and came back with a stick. He hit Camero with it, using hard blows. Moran heard something hit his jacket and saw that it was blood. Moran testified that Arnold passed the stick to Johnson, who hit Camero with it. Then, Arnold and Johnson returned to the car. Moran did not see where Garcia went. Moran testified he heard Camero having trouble breathing and he just stood there and looked at Camero.[7] Garcia yelled for Moran to return to the car. He did, and the group returned to the motel.

When they arrived at the motel room, Johnson's girl friend, Tamara Slattum, and her friend were there.

---

[6] RP (Nov. 16, 1998) at 1203.

[7] Moran testified that it sounded "like something [was] stuck in his throat." RP (Nov. 16, 1998) at 1241.

Johnson and/or Garcia brought the bloody closet rod into the room and washed it. According to Johnson, Arnold had blood on his hands and Moran had blood on his shirt. Slattum testified that she saw one of the four (she did not recall which one) washing the closet rod. She also saw Garcia wiping off his shoes with a towel and, when he was finished, she saw that the towel had blood on it.

According to Moran, Johnson changed his clothes in the bathroom. Moran threw his own jacket onto the pile of Johnson's clothes. There were also motel towels on the pile that they had used to wipe blood off their shoes. Moran testified that Johnson told him to put the closet rod down his pants and take it to the car. Someone else took the pile of clothes and towels to the car.

Johnson, Moran, Garcia, and Arnold drove to Chase Lake, near the motel room. Johnson stopped the car on the bridge and everyone got out. According to Johnson, Moran and Arnold threw the clothes and the closet rod into the lake. According to Moran, Johnson threw the clothes in the lake and Garcia threw in the closet rod.

The four then drove to a Denny's Restaurant on Aurora Avenue. They ordered food and left without paying. Moran testified that Johnson instructed him to take a steak knife from the restaurant before they left. Moran complied and put it in his pocket.

Once again, the group drove to where Camero was lying. According to Johnson, when they arrived, Moran got out of the car, but Johnson did not see where he went or what he did. Nobody else got out of the car. Between two and four minutes later, Moran returned to the car. Johnson testified that Moran said he had slit Camero's throat and threw the steak knife away.

According to Garcia, when they arrived at where Camero was lying, Moran got out of the car and walked to the large tree. The rest of the group stayed in the car. Garcia testified that Moran returned to the car a few minutes later and said that Camero was dead because he was not breathing and

had no pulse. Garcia also testified that Moran said that he used the steak knife to make sure Camero was dead.

According to Moran, Johnson asked Moran for the steak knife, and Moran gave it to him. When they arrived at where Camero was lying, only Johnson got out of the car. Johnson said he would be right back. When he returned, Johnson said nothing.

Afterwards, the group drove back to the motel, where they stayed until morning.

On the morning of April 8, two schoolchildren found Camero's body under the tree. The Snohomish County Medical Examiner, Dr. Norman Thiersch, went to the location of Camero's body and observed "a young man present underneath some cedar trees lying on what would be landscaping bark, cedar twigs, with injuries to his head."[8] Dr. Thiersch also observed a wound to Camero's neck, which he described as "very superficial."[9]

The same day, when the police first questioned Moran, he told them he had not seen Camero at all on April 7. He said that he spent the entire day in Everett with another person and stayed there overnight and he had cuts on his face because he was beaten up by two people who stole his watch. Later that day, Moran changed his story and said he met Camero at the Everett bus station. But, he said, Camero took one bus, and Moran and his friend took another one. Later, Moran said that he and Camero had taken a short bus ride together. In his written statement to the police, in which he acknowledged he was fully advised of, and understood, his constitutional rights, Moran wrote: "I was not there when my friend Stephen Camero got killed. I don't know who did."[10]

Camero's body was transported to the medical examiner's office, where Dr. Thiersch performed an autopsy. Camero's blood draw showed a blood alcohol concentration of .25 and

[8] RP (Nov. 4, 1998) at 185.

[9] RP (Nov. 4, 1998) at 186.

[10] RP (Nov. 9, 1998) at 530.

established that he was intoxicated. Dr. Thiersch observed a number of contusions running up Camero's left upper chest and shoulder. He testified that the direction of the contusions indicated that the injuries were inflicted by a long, thin, rod-like object. There were contusions and bruises on the front of Camero's right shoulder, in a pattern similar to those on his chest and left shoulder area. Dr. Thiersch also observed an abrasion on Camero's right armpit, which Dr. Thiersch believed had been inflicted by a blunt object. There was blood spatter along the length of Camero's right forearm and on his hand.

On the back of Camero's body, there was a contusion on his back right shoulder. There were bruises on his left lower back area. Camero also had two lacerations on the back side of his right ear and bruising of the structures of the ear. Dr. Thiersch testified that the lacerations were the result of blunt force coming from front to back.

Dr. Thiersch testified that the knife wound on Camero's neck was very superficial. No major arteries or veins were cut by that wound. Likewise, the puncture wounds, which could have been inflicted with a pen, cut into soft tissue and were not lethal.

At trial, using a photograph of a front view of Camero's head, Dr. Thiersch described the head injuries:

There are a number of abrasions, scrapes, to the eyebrow region. There are injuries about the nose, abrasions, scrapes on his nose.

In addition, there are abrasions on his left cheek in addition to other abrasions and contusions on his right cheek. There is a contusion, a bruise of his upper lip, and what you see here is a laceration, as I explained before, a tearing of the tissue. That is present here.

There is another laceration present down lower on the right side of his face. Both of these laceration[s] extend into the tissues below the skin, the subcutaneous tissues. And the jaw, the mandible here, is fractured underneath here.

What you also see are the missing teeth. These holes are here with the teeth of his upper jaw of his maxilla are absent, or recently absent.

The other feature—a couple other features that you see here. There is an incision, we talked earlier about the cut to his neck. That's what is depicted here. It's a little bit broader here.

In addition, you see a series of puncture-type wounds along the left side of his neck. There are five here, and then there is another one lying off a little bit further back on the left side.[11]

Dr. Thiersch did not testify about any injuries to the back of Camero's head.

Dr. Thiersch found fragments of Camero's teeth in his stomach and bronchus and extensive amounts of blood in Camero's larynx and trachea. There was a laceration of the left kidney and a hemorrhage in the tissue around the kidney. He said the injury to the kidney was caused by significant force and was a life-threatening injury if not treated.

Dr. Thiersch testified that Camero died of a subdural hemorrhage, which is bleeding inside the brain. Camero's death was caused by blunt force injuries to his head and face consistent with being kicked or hit with a rod.

According to Dr. Thiersch, the injuries to Camero's brain were consistent with external injuries to his head, such as the injuries to Camero's chin, mouth, cheeks, and other areas of his head. These injuries were inflicted by a blunt object that causes an abrasion, bruise, contusion, or laceration, rather than by a sharp object that causes a cut or a stab. Camero's broken jaw was caused by significant force coming from front to back. Dr. Thiersch also testified that the force that broke his jaw could have caused the fatal brain injury. The band of abrasions running across Camero's head near his eyebrow, which Dr. Thiersch testified were fairly significant injuries, were caused by a blunt force. These injuries could have been caused by a blow, kick, or a strike with a closet rod.

---

[11] RP (Nov. 4, 1998) at 199-200.

The abrasions and contusions running from Camero's nose and mouth to his ear were caused by multiple impacts with a blunt force. They could have been caused by a blow, punch, or a kick, or being struck with a blunt object. The abrasions on Camero's left cheek and on the outside of his upper lip were also caused by blunt impact. Dr. Thiersch concluded that the extensive lacerations on Camero's right ear were likewise caused by a blunt force such as a blow or a kick or being struck with an object such as a closet rod. Similarly, he concluded that the confluent contusions on Camero's left chest and left upper arm, right upper arm and shoulder, and abdomen were caused by strikes with a round rod-like object.

Dr. Thiersch estimated that Camero had been hit about 20 times.

When Dr. Thiersch was asked, "Why did Stephen Camero die?", he answered: "Mr. Camero died due to blunt impact to his head which resulted in bleeding around his brain. A subdural hemorrhage."[12] Moran concedes that the medical examiner's testimony established that Camero's death most likely resulted from the beating with the closet rod and not the initial beating or the pen or knife wounds.[13]

Arnold and Moran were charged as codefendants with premeditated first degree murder. Johnson and Garcia were charged with, and pleaded guilty to, second degree assault and rendering criminal assistance and agreed to testify at Arnold's and Moran's trial.

Prior to trial, the information was amended to add a deadly weapon allegation (the closet rod). Moran and Arnold were tried together before the same jury. Moran's defense was a general denial. He argued that the other witnesses were lying and he was telling the truth.

The trial court instructed the jury on the charged crime of first degree premeditated murder, on accomplice liability, and on the lesser included offenses of first degree attempted

---

[12] RP (Nov. 4, 1998) at 231.

[13] Br. of Appellant at 33.

murder, second degree murder, and first degree manslaughter. Arnold was convicted of second degree murder while armed with a deadly weapon. Moran was convicted of first degree manslaughter while armed with a deadly weapon.

## DISCUSSION

### I. Accomplice Liability Instruction

The trial court gave the following accomplice liability instruction:[14]

A person who is an accomplice in the commission of a crime is guilty of that crime whether present at the scene or not.

A person is an accomplice of another person in the commission of a crime if with knowledge that it will promote or facilitate the commission of a crime, he

(1) solicits, commands, encourages, or requests another person to commit it; or

(2) aids or agrees to aid another person in planning or committing it.

The word "aid" means all assistance whether given by words, acts, encouragement, support, or presence. A person who is present at the scene and ready to assist by his or her presence is aiding in the commission of the crime. However, more than mere presence and knowledge of the criminal activity of another must be shown to establish that a person present is an accomplice.[15]

Moran proposed an accomplice liability instruction that substituted "the crime" for "a crime" in the second sentence of the instruction and substituted "the crime" for the word "it" in the two subsections:

A person is an accomplice in the commission of a crime if, with knowledge that it will promote or facilitate the commission of *the* crime, he or she either;

---

[14] This instruction is similar to 11 *Washington Pattern Jury Instructions: Criminal* (WPIC) 10.51 (2d ed. 1994).

[15] Clerk's Papers (CP) at 53.

(1) solicits, commands, encourages, or requests another person to commit the crime; or

(2) aids or agrees to aid another person in planning or committing the crime.[16]

The court did not give Moran's proposed instruction, and Moran did not object to the instruction given by the court.

 The State concedes that the accomplice liability instruction was erroneous.[17] The instruction departs from the language of the accomplice liability statute, RCW 9A.08.020(3)(a), by using the phrase "a crime" rather than "the crime." "It is a misstatement of the law to instruct a jury that a person is an accomplice if he or she acts with knowledge that his or her actions will promote *any* crime."[18] "[I]n order for one to be deemed an accomplice, that individual must have acted with knowledge that he or she was promoting or facilitating *the* crime for which that individual was eventually charged."[19] This instruction relieved the State of its burden of proof because it allowed the jury to convict Moran if he had general knowledge of any crime, not just the charged crime. The accomplice liability instruction Moran proposed, not the instruction the court gave, is the correct statement of the law of accomplice liability.[20]

The erroneous accomplice liability instruction does not, however, require reversal if it is harmless error.

[A]n erroneous jury instruction that omits or misstates an element of a charged crime is subject to harmless error analysis to determine whether the error has not relieved the State of its burden to prove each element of the case. To determine whether an erroneous instruction is harmless in a given case, an analysis must be completed as to each defendant and each

---

[16] CP at 77 (emphasis added).

[17] *See State v. Cronin*, 142 Wn.2d 568, 579, 14 P.3d 752 (2000); *State v. Roberts*, 142 Wn.2d 471, 513, 14 P.3d 713 (2000).

[18] *State v. Brown*, 147 Wn.2d 330, 338, 58 P.3d 889 (2002).

[19] *Cronin*, 142 Wn.2d at 579.

[20] *See* RCW 9A.08.020(3)(a).

count charged. From the record, it must appear beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.[21]

In *State v. Brown*, the error in the accomplice liability instruction was harmless as to the defendant's robbery conviction because there was evidence that the defendant acted as a principal with respect to that crime. But, the error in the instruction was not harmless with respect to the defendant's rape and assault convictions because there was no evidence that he acted as a principal and the jury could have concluded that because Brown robbed the victim, he was also guilty as an accomplice when one of his codefendants raped the victim and another codefendant assaulted the same victim.[22]

Initially, the State argues that because Moran did not object to the accomplice instruction below, he is precluded from raising this issue for the first time on appeal. We disagree. An appellant may raise an error for the first time on appeal if the error is a manifest error involving a constitutional right.[23] Moran argues that the erroneous accomplice liability instruction relieved the State of its burden to prove an essential element of the charged crime. If the instruction allows the jury to convict the defendant without finding an essential element of the crime charged, "the State has been relieved of its burden of proving all elements of the crime(s) charged beyond a reasonable doubt, and thus the error affected his constitutional right to a fair trial."[24] Moran can raise this issue for the first time on appeal.

Moran argues that the State cannot prove that the error in the instruction was harmless beyond a reasonable doubt

---

[21] *Brown*, 147 Wn.2d at 344.

[22] *State v. Brown*, 147 Wn.2d 330, 341-42, 58 P.3d 889 (2002).

[23] RAP 2.5(a)(3). A "manifest" error is one that has practical and identifiable consequences in the trial of the case. *Roberts*, 142 Wn.2d at 500; *State v. WWJ Corp.*, 138 Wn.2d 595, 603, 980 P.2d 1257 (1999).

[24] *State v. Stein*, 144 Wn.2d 236, 241, 27 P.3d 184 (2001); *see also State v. Stovall*, 115 Wn. App. 650, 63 P.3d 192 (2003).

for two reasons: (1) it was more likely that he was convicted as an accomplice than as a principal and (2) under the erroneous instruction, the jury could have convicted him as an accomplice based on uncharged crimes.

## A. Conviction as a Principal

The State charged both Moran and Arnold with premeditated first degree murder. The jury convicted Moran of first degree manslaughter while armed with a deadly weapon and Arnold of second degree murder while armed with a deadly weapon.

A person is guilty of first degree manslaughter when he "recklessly causes the death of another person."[25] A person is guilty of second degree murder when "[w]ith intent to cause the death of another person but without premeditation, he or she causes the death of such person or of a third person."[26] By convicting Moran and Arnold of different crimes, the jury assigned different degrees of culpability to them, namely, it assigned different mental states: recklessness to Moran and intent to kill to Arnold. This difference establishes that the jury convicted each of them as a principal. Had the jury convicted one of them as an accomplice of the other, both Arnold and Moran would have been convicted of the same degree of murder or manslaughter. Further, given Moran's general denial, had the jury believed Moran, it would have acquitted him.[27]

If there is evidence that a defendant facing multiple charges directly participated as a principal in one of the charged crimes, the difference between "a crime" and "the crime" in the accomplice liability instruction is harmless beyond a reasonable doubt with respect to those crimes.[28] Here, Moran was charged with only one crime, namely, premeditated first degree murder, and the jury was also

---

[25] RCW 9A.32.060(1)(a).

[26] RCW 9A.32.050(1)(a).

[27] *See State v. Borrero*, 147 Wn.2d 353, 365, 58 P.3d 245 (2002).

[28] *Brown*, 147 Wn.2d at 341.

instructed on the lesser included offenses of first degree attempted murder, second degree murder, and first degree manslaughter. If there is evidence that he acted as a principal, then the error in the accomplice liability instruction is harmless beyond a reasonable doubt.

There was evidence to show that Moran acted as a principal with respect to the manslaughter conviction and that Camero died as a result of the second assault. Moran's own testimony established that Camero was alive and his breathing was regular and strong after the first assault. Dr. Thiersch's testimony that Camero died from a blunt force impact to the head and face supports the theory that he died from a beating with an object such as a closet rod. The beating with the closet rod occurred during the second assault. And, there was evidence that Moran hit Camero with the closet rod. There was evidence to support the jury's conviction of Moran of first degree manslaughter as a principal. There likewise was evidence that Arnold acted as a principal in committing second degree murder.

We reject Moran's argument that he was convicted as an accomplice because Camero died as a result of the first assault in which Moran did not participate. The evidence, particularly Dr. Thiersch's testimony, supports the conclusion that Camero did not die as a result of the first assault, but rather died from the injuries inflicted in the second assault. Indeed, Moran concedes in his opening brief on appeal that Camero likely died as a result of the beating with the closet rod, rather than the stomping or kicking or the pen or knife wounds.[29]

Because the jury convicted both Moran and Arnold as principals, the erroneous accomplice liability instruction could not have affected the verdict, and the error in the instruction was harmless beyond a reasonable doubt.

---

[29] Also, as discussed, if the jury had convicted Moran as an accomplice, it would have assigned the same mental state to both him and Arnold and would have convicted them of the same crime.

## B. Conviction Based on Uncharged Crimes

Moran argues that, under the erroneous accomplice liability instruction, he could have been convicted as Arnold's accomplice based on crimes the State did not charge and his admission that he concealed and destroyed evidence. Thus, he argues, the error in the instruction was not harmless.

This argument was first raised in *State v. Bui*, which was consolidated with *State v. Cronin*.[30] Bui and his codefendant were charged with three counts of first degree assault.[31] The trial court gave the erroneous accomplice liability instruction. On appeal, Bui argued that the error in the instruction was not harmless because the jury could have found him guilty as an accomplice based on evidence that he facilitated a verbal exchange between rival gangs.

The Supreme Court agreed and held that the error in the instruction was not harmless because the instruction may have allowed the State to secure a conviction without having to prove beyond a reasonable doubt that Bui knew he was facilitating the commission of the crime of assault, the only crime with which he was charged. Of significance to the court was the fact that the prosecutor explained accomplice liability in terms of the erroneous instruction and, as the Supreme Court described it, "implored the jury to return a verdict of guilty if it found that Bui had facilitated *any crime*."[32]

---

[30] 142 Wn.2d 568.

[31] Another codefendant was charged with one count of first degree assault.

[32] *Cronin*, 142 Wn.2d at 580. The prosecutor stated, in part:

DOES THE STATE HAVE TO PROVE THAT LINH BUI KNEW THAT THE PERSON IN HIS CAR WOULD GET OUT AND SHOOT? NO. IT'S THE COMMISSION OF A CRIME.

DID LINH BUI KNOW BY HIS ACTIONS WHEN HE CHASED AFTER ANOTHER CAR, WHEN HE PULLED ACROSS IN FRONT OF THEM AND BLOCKED THEM OFF IN AN INTERSECTION, ALLOWED HIS PASSENGERS TO GET OUT, DOES COMMON SENSE SHOW US THAT HE KNEW HE WAS FACILITATING THE COMMISSION OF A CRIME? *HARASSMENT? PHYSICAL ASSAULT? ANY CRIME*.

*Id.* at 572-73. Also of significance to the court was the fact that, during deliberations, the jury asked the court: "To be an accomplice to first degree assault, does he need to have knowledge that he is assisting in a *first degree*

In *State v. Stovall*,[33] the trial court gave a similar erroneous accomplice liability instruction. The jury found Stovall guilty as an accomplice to the charged crime of delivery of cocaine between persons A and B. In closing, the prosecutor argued that Stovall could be convicted of the charged transaction between A and B because he participated in an uncharged attempted delivery between A and C. Based on the prosecutor's argument and the erroneous instruction, this court concluded that the jury could have believed that Stovall had nothing to do with the delivery between A and B, yet was nevertheless guilty as an accomplice based on his participation in the A-C transaction. After thoroughly examining the record, we concluded that the error in the instruction was not harmless, and we reversed Stovall's conviction, holding: "[I]f evidence of an uncharged crime is before the jury and the State argues that the defendant's participation in such crime triggered liability for the specific crime charged, reversal is required."[34]

Based on the record before us in this case, we conclude that the error in the accomplice liability instruction was harmless beyond a reasonable doubt. As in *Bui* and *Stovall*, Moran was charged with only one crime. But, unlike those cases, the prosecutor in this case addressed only the charged crime during closing argument. The prosecutor did not emphasize the "a crime" language in the instruction and did not tell the jury it could find accomplice liability based on an uncharged crime. Rather, all the prosecutor did was read the language of the instruction and argue that, for premeditated murder in the first degree, Moran "is both an accomplice and principal, that he and Tagan Arnold go back knowing they're going to kill Stephen Camero, take the

---

*assault* or that he is promoting a crime of *any kind*[?]" *Id.* at 573. The trial court responded: "The defendant does not need to know the specific crime (1st° assault) that will occur but must know the general nature of the crime that will occur[.]" *Id.* The Supreme Court found that the court's response could have heightened the error in the instruction.

[33] 115 Wn. App. 650, 63 P.3d 192 (2003).

[34] *Id.* at 652.

steps to do that, are eventually successful in doing that."[35] The prosecutor did not argue that Moran was an accomplice with respect to any of the lesser included crimes of attempted murder in the first degree, murder in the second degree, and manslaughter in the first degree.

Further, the uncharged crimes of concealing and destroying evidence that Moran relies on for his argument do not relate to the facts or elements of the charged crime or any lesser included crime. Moreover, according to Moran's own testimony, these uncharged crimes occurred after the fatal injuries to Camero. They could not, therefore, have played a role in the jury's finding Moran guilty of recklessly causing the death of Camero—first degree manslaughter.

The language of the accomplice liability instruction given in this case lends further support to the conclusion that the erroneous use of "a" rather than "the" in the instruction was harmless error. Specifically, the accomplice liability instruction informed the jury that a person is an accomplice of another "in the commission of a crime if with knowledge that it will promote or facilitate the commission of a crime, he (1) solicits, commands, encourages, or requests another person to commit *it*; or (2) aids or agrees to aid another person in planning or committing *it*."[36] By contrast, the accomplice liability instruction in *Brown, Bui*, and *Cronin* used, instead of the word "it" in the two alternatives, the words "the crime" in the first alternative and "a crime" in the second.[37] Here, unlike in *Brown, Bui*, and *Cronin*, because the instruction used the word "it" there was no crime but the charged crime the jury could have considered when determining whether Moran was an accomplice.

---

[35] RP (Nov. 17, 1998) at 1394.

[36] CP at 53 (emphasis added).

[37] The instruction given in those cases was WPIC 10.51: "A person is an accomplice in the commission of a crime if, with knowledge that it will promote or facilitate the commission of a crime, he or she either: (1) solicits, commands, encourages, or requests another person to commit the crime; or (2) aids or agrees to aid another person in planning or committing a crime."

We conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error in the accomplice liability instruction. Accordingly, the error is harmless and does not require reversal of Moran's conviction.

## II. Admission of Moran's Letter to David Johnson

According to defense counsel, shortly after Moran's arrest, Jessie Burch, a friend of Moran's girl friend, made a favorable statement to the police about Moran's demeanor the day after Camero's death. Later, when defense counsel tried to interview her, Burch became hostile and said she had changed her mind about Moran. When asked what information caused her to change her mind, Burch replied that there was no information, but rather it was "just what was in her own head."[38] Burch told defense counsel that she did not want to do anything to help Moran because he might be guilty.

Defense counsel then asked Moran if he had any idea why Burch became hostile. Eventually, Moran wrote a letter to a friend, David Johnson, asking Johnson to talk to Burch. The State moved for the admission of Moran's letter to Johnson.

The court admitted the letter on the ground that it was relevant and probative of Moran's "particular position on this case. . . . [I]t obviously shows the defendant's propensity to try to influence people so that they will be cooperative and more favorable to him and that in and of itself is probative."[39]

Burch did not testify at trial.

Moran's letter to David Johnson states in part (with spelling errors):

> Jessi is being a bitch. she's telling my attourney that she thinks that I killed Steve now. Can you talk to the bitch. In her

---

[38] RP (Nov. 2, 1998) at 58.

[39] RP (Nov. 2, 1998) at 62-63.

statement to the cop's she was behind me all the way now she's being a cunt.[40]

The letter is signed "Your homie Jeramie."

On appeal, Moran argues that the trial court erred by admitting the letter. He contends that the letter's minimal probative value was outweighed by the danger of unfair prejudice. Moran argues that the letter cannot be considered a threat to a witness, nor was it admissible on the ground that the State charged Moran with intimidating a witness. He points to the offensive language in the letter and the reference to "homie" which, he argues, raises the image of gang violence. Moran also argues that the letter showed him as an aggressive person, which contradicted his testimony that he was afraid of Johnson and Arnold.

We review a trial court's evidentiary decision on the issue of whether probative value outweighs prejudicial effect for abuse of discretion.[41] "An abuse of discretion exists '[w]hen a trial court's exercise of its discretion is manifestly unreasonable or based upon untenable grounds or reasons.' "[42]

Evidence that a defendant threatened a witness is relevant because it reveals a consciousness of guilt.[43] Its probative value outweighs the possibility of unfair prejudice.[44] Likewise, evidence that the defendant, or a person acting on behalf of the defendant, tried to prevent a witness

---

[40] Br. of Appellant, App.

[41] *State v. Greathouse*, 113 Wn. App. 889, 918, 56 P.3d 569 (2002), *review denied*, 149 Wn.2d 1014 (2003).

[42] *State v. Neal*, 144 Wn.2d 600, 609, 30 P.3d 1255 (2001) (quoting *State v. Stenson*, 132 Wn.2d 668, 701, 940 P.2d 1239 (1997), *cert. denied*, 523 U.S. 1008 (1998)).

[43] *State v. McGhee*, 57 Wn. App. 457, 460-61, 788 P.2d 603 (1990). In *McGhee*, the witness who was threatened was also one of the victims, and the court found evidence of the threat also relevant because it tied the defendant to the victim.

[44] *Id.* at 462.

from appearing and testifying at trial is relevant because it is evidence of the defendant's guilt.[45]

Although not a threat, Moran's letter to Johnson can be reasonably interpreted as a request that Johnson try to get Burch to change her mind about Moran's guilt and return to her initial favorable statement. While the word "homie" may have gang connotations and the use of offensive language in the letter may have been prejudicial, the trial court's decision that the probative value outweighed the prejudicial effect was not an abuse of discretion.[46]

*III. Prosecutor's Comments During Closing Argument*

■ ■ Moran asserts that the prosecutor's comments during closing argument constitute misconduct requiring reversal.

At the beginning of closing argument, the prosecutor told the jury:

[L]adies and gentlemen; Stephen Camero waits, he is frozen in time in the photographs you have seen in this case. You see him as he is laying [sic] under the tree after he is dead. You see him subjected to the indignities on the autopsy table. You see him as well in image in your mind's eye as he is waiting, still alive, under a tree in Edmonds for his killers to come and finish him off.[47]

At the end of closing argument, the prosecutor stated:

So Stephen Camero waits. I don't know, and I submit that we will never know, what we do here will quiet his spirit, will be an

---

[45] *State v. Kosanke*, 23 Wn.2d 211, 215, 160 P.2d 541 (1945) (holding such evidence to be "a circumstance for the jury to consider as not being likely to be the conduct of one who was conscious of his innocence, or that his cause lacks truth and honesty, or as tending to show an indirect admission of guilt").

[46] Moran also argues that the trial court erred by denying his counsel's motion to impeach Danny Garcia with evidence of his prior conviction of a drug offense. Counsel wanted to use this evidence to refute Garcia's assertion that he knew nothing about good time. We need not reach this issue because, after Moran's appellate brief was filed, defense counsel submitted a declaration stating that before the trial ended, she learned that Garcia did not in fact have a prior drug offense conviction.

[47] RP (Nov. 17, 1998) at 1383.

end of this for him, but what Stephen Camero waits for now, I submit, is for this case to be done, what happened in April of 1998 to be over with. He waits for your verdict.[48]

Moran did not object. On appeal, he argues that these statements deprived him of a fair trial and that they were so flagrant and ill intentioned that they could not have been cured by an instruction.[49]

"The prosecutor has wide latitude in closing argument to draw reasonable inferences from the evidence and to express such inferences to the jury."[50] The prosecutor's initial comments in this case were proper inferences drawn from the evidence. Specifically, the evidence showed that Camero was not dead after the first attack and was left lying, alive but severely injured, under the tree. The evidence also showed that he was found dead under a tree and that an autopsy was performed on his body.

The second set of comments was an appeal to the jury's emotion, but we find they are not so flagrant and ill-intentioned that, had Moran objected, the effect of the comments could not have been cured by an instruction.[51] The prosecutor's statements during closing argument are not grounds for reversal.

We affirm Moran's conviction.

GROSSE and KENNEDY, JJ., concur.

Review denied at 151 Wn.2d 1032 (2004).

---

[48] RP (Nov. 17, 1998) at 1396.

[49] A defendant who does not object to a prosecutor's comment is deemed to have waived the objection on appeal unless the comments were so flagrant and ill intentioned that they evince "an enduring and resulting prejudice that could not have been neutralized by an admonition to the jury." *Stenson*, 132 Wn.2d at 719.

[50] *Stenson*, 132 Wn.2d at 727.

[51] We disagree with Moran's argument that these comments amount to an intimation that Camero's soul was in a state of purgatory or that Moran was the devil's minion.