[No. 28282-8-II.   Division Two.   March 22, 2005.]

THE STATE OF WASHINGTON, *Respondent*, v. STACEY R. FISHER, *Appellant*.

*James K. Morgan*, for appellant.

*Susan I. Baur, Prosecuting Attorney*, and *J. Tobin Krauel, Deputy*, for respondent.

¶1 HOUGHTON, J. — Stacey Russell Fisher appeals his conviction of second degree child assault, arguing that the trial court erred in admitting a child hearsay statement, in allowing the State to cross-examine defense character witnesses with evidence that he had spanked the victim, and in denying a motion for a mistrial and a motion for a new trial based on prosecutorial misconduct. We affirm.

## FACTS

¶2 On September 22, 2000, Deidre Toews left her house at about 9:00 P.M. to pick up her mother at work. She left her 29-month-old son Ty and her year-old daughter Aisha in the care of her boyfriend Fisher. When Toews left, Aisha was sleeping in her playpen in the living room and Ty was sitting on the living room couch.

¶3 Toews called approximately 30 minutes later to check on the children and Fisher said that Ty had fallen down the stairs. Toews told Fisher to keep Ty awake because of a possible head injury. Toews and her mother, Bette Marsh, rushed home to find Ty in an upstairs bedroom with the lights dimmed. His eyes were rolled back, his head was swollen, discolored, and "mushy," and he was vomiting. 5 Report of Proceedings (RP) at 701. Marsh called 911 dispatch for medical assistance. Emergency medical technicians examined and treated Ty and transported him to the hospital. RP at 116-17.

¶4 Fisher told Dr. Dennis Ford, an emergency room physician, that he had fallen asleep while watching the children. He awoke when he heard a noise and saw Ty bleeding, and he assumed that Ty had fallen down the stairs. When Ford examined Ty, the child told the doctor he had fallen. Ford then asked Ty whether he fell down the stairs, and Ty answered affirmatively.

¶5 Ty initially received emergency medical treatment, including intravenous (IV) therapy, x-rays, scans, and examinations. The emergency staff placed him in the room closest to the nurse's station where he could be constantly monitored. The staff kept him restrained to complete the x-rays. He was admitted to the hospital from the emergency room and placed in a hospital bed. His chin wound had been numbed and sutured closed.

¶6 Dr. Susan Klenk, a family practice physician, saw Ty at approximately 10:00 the next morning. Toews was the only other person in Ty's room, and Klenk spoke with her first. Klenk then asked Ty what had happened, and he pointed to his forehead and said, "Stacey hit me right here." 1 RP at 88.

¶7 Investigators examined the farmhouse where Toews lived with her children and found no blood within four feet of the base of the stairs, although they did find a few drops of blood on the stairs. They also found blood on Ty's clothing, streaks of blood on the living room floor, and a pool of blood containing blond hairs in the toy corner of the living room. Ty has blond hair.

¶8 Two days after the incident, Toews found a broken easel with blood on it hidden in the toy corner. Fisher told her that he had stepped on it. He then took the pieces and threw them into a nearby ravine.

¶9 The State charged Fisher with one count of second degree child assault. Before trial, the court conducted a hearing to determine the admissibility of Ty's hearsay statement to Klenk.

¶10 Klenk testified that Ty was admitted to the hospital for head trauma and he remained hospitalized for six days. Klenk described Ty's injuries as a scrape on the bridge of his nose, bruising on his left ear and the left side of his scalp that extended to the right side, a swollen area on the back of his head, bruising and a large hematoma on his forehead, bruising and scraping on his neck and the upper part of his back, and a small bruise on his right buttock. She said that she reviewed Ford's handwritten notes before examining Ty and knew that, although they described a fall down the stairs as the reported cause of his injuries, they also disclosed the possibility of abuse. Ford's notes indicated further, however, that Ty did not exhibit fear toward Fisher while in the emergency department.

¶11 Klenk also reported that although Ty's injuries seemed consistent with a fall down the stairs, she could not determine their cause from mere observation. She added that a child's abuse disclosure would be relevant to his treatment and length of stay. She also said that although she probably introduced herself as a doctor to Ty's mother, she was not sure whether she introduced herself to Ty. She also was not sure whether she wore a white jacket or stethoscope, although she did wear her name tag identifying her as a doctor.

¶12 The State argued that Ty's statement to Klenk was admissible under ER 803(a)(4) as a statement made for the purpose of medical diagnosis, noting that Klenk asked Ty about the cause of his injuries so that she could make a diagnosis and offer him the best care. The court found the statement admissible under ER 803(a)(4) because, regard-

less of the doctor's motive in questioning, Ty had no reason to lie. When defense counsel argued that nothing showed that Ty understood that the statement he made would further medical diagnosis or treatment and that the test for admitting hearsay under ER 803(a)(4) had not been met, the court agreed to reconsider the issue.

¶13 On September 5, the court heard additional argument on the admissibility of Ty's statement. The State argued that the statement was admissible under the child hearsay statute, RCW 9A.44.120, and the *Ryan* factors as well as ER 803. *State v. Ryan*, 103 Wn.2d 165, 691 P.2d 197 (1984). When the court again ruled that the statement was admissible under ER 803(a)(4), defense counsel argued that Ty's competency must be considered, and the court called for briefing on the issue.

¶14 At the next hearing, the State noted that, although the court had ruled Ty's statement admissible under ER 803(a)(4), "Both parties want to proceed under also the *Ryan* theory." RP (Oct. 26, 2001) at 126. The State then called Ty to the stand to determine his competency. After a brief examination, during which Ty identified the prosecutor as a "dog" and his grandmother as a "puppy," the court interrupted the questioning, having concluded that Ty was not competent to testify. RP (Oct. 26, 2001) at 141.

¶15 The State then called Toews, who testified that she could not think of a reason why Ty would lie about Fisher's culpability. She admitted that Ty told stories but added that he "always comes out with the truth." RP (Oct. 26, 2001) at 227.

¶16 Marsh testified that she did not think Ty would make false accusations. She also testified that when Fisher lay next to Ty in his hospital bed the day after the incident, the child seemed fearful and asked her not to leave. She added that Ty expressed fear about going home and asked several times if Fisher was there. She admitted that Ty's paternal grandmother had told Ty repeatedly, after appearing at the hospital two days after the incident, that she would protect him from Fisher.

¶17 During argument, the State discussed the statement's admissibility under the *Ryan* factors, but defense counsel argued that if Ty was incompetent, there was no reason to discuss those factors. The court agreed that the *Ryan* factors did not warrant discussion because the statement was admissible under ER 803(a)(4). Although Ty was not competent to testify as a witness, he was competent to understand that he had been hurt and to say who had injured him. In a separate ruling, the court found that a detective's testimony that Fisher had admitted to spanking Ty on occasion was not admissible as part of the State's case in chief.

¶18 At trial, the witnesses testified as set forth above. In addition, Marsh testified that after Fisher had spent time talking to the investigating authorities, he spoke with her in the hospital parking lot and said, "I might as well say I did it and get it over with." 2 RP at 204.

¶19 Dr. Naomi Sugar, a child abuse consultant, testified that Ty's injuries did not comport with a fall down the stairs. She opined that it was much more likely "that there was an inflicted injury or abusive injury to this child." 2 RP at 267.

¶20 When defense counsel called several witnesses to testify about Fisher's reputation for being peaceful and gentle with children, the court allowed the State to cross-examine them by asking if they had heard that Fisher had spanked Ty and had referred to spanking him in a letter.

¶21 The prosecutor asked Toews whether she talked to Ty after he made the statement to Klenk and whether she tried to find out how he got hurt. Defense counsel objected, arguing that the State had paused after asking Toews whether she asked Ty what had happened, and thus had tried to elicit inadmissible hearsay evidence. After observing that his client could not afford a mistrial, defense counsel asked the court to admonish the prosecutor. The court said that the objection was well taken but that it would not be proper to ask the jury to disregard the question. "But I agree with the analysis that it was irrel-

evant and that it was fraught with untoward possibilities." 5 RP at 744. Toews testified that once when she asked Fisher how Ty got hurt, Fisher said that he should say he did it and get it over with. She also said that Fisher had referred to Ty as the "Anti-Christ." 5 RP at 731.

¶22 Fisher testified that after Ty fell, he bathed and put him to bed before Toews called. Fisher stated that he then wiped up the blood downstairs and stacked up the easel he had broken. He was downstairs when Toews and Marsh arrived.

¶23 The State began its closing argument by explaining that Ty was not competent to testify and that the child "wouldn't be able to handle this type of intense cross-examination." 8 RP at 1107. Defense counsel objected and the court instructed the jury to disregard argument the law and the evidence did not support.

¶24 The State then discussed Fisher's actions after Ty was injured, pointing out that Fisher had bathed him and put him to bed. "What happens with a head injury when you fall asleep? You die. You die. Death. Death if you fall asleep with a head injury." 8 RP at 1125. Defense counsel did not object.

¶25 The State also asked the jury whether they remembered "that part of Sgt. Nelson's testimony when he has the defendant on tape and boxed in? He says, 'What are they going to do to me? Maybe I should just as well admit it.' " 8 RP at 1139. Defense counsel again objected: "That's not the evidence. Talking about Nelson in that context, that is not the evidence." 8 RP at 1139. The court again instructed the jury to disregard any argument the evidence did not support.

¶26 In his closing argument, defense counsel responded to the implication that Fisher put Ty in bed and dimmed the lights so that the child would fall asleep and die. "But what he tells us, and what in fact he told Deidre . . . is that he tried to keep him awake until she got home. When she got home, what did she tell you? The boy was awake." 8 RP at 1204.

¶27 In rebuttal, the State responded that Toews had asked Fisher to wake Ty up and keep him awake and that Fisher had ignored this instruction. "If you want to hide somebody, you want them to be asleep and you want them to be in the dark so they can't be seen. That's where you hide a child that's been abused." 8 RP at 1246. When defense counsel objected that nothing in Toews's statement indicated that Ty had been asleep, the court overruled the objection.

¶28 Fisher moved for a mistrial after the jury began deliberating, arguing that the prosecutor committed misconduct in examining Toews and during closing argument. The court denied the motion without prejudice because by then the jury had reached a verdict. After the jury announced that it had found Fisher guilty as charged, he filed a motion for a new trial, again on the basis of prosecutorial misconduct. The court denied the motion. Fisher appeals.

ANALYSIS

Hearsay Testimony

*Crawford v. Washington*

¶29 Fisher first contends that the trial court erred in admitting hearsay statements. He asserts that the United States Supreme Court's recent ruling in *Crawford*[1] precludes the treating doctor from testifying that Ty identified Fisher as his assailant. *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). More specifically, he argues that *Crawford* renders inadmissible Klenk's statement that when she asked Ty what had happened, he pointed to his forehead and said, "Stacey hit me right here." I RP at 88.

¶30 In *Crawford*, the Court held that the confrontation clause bars introducing a testimonial hearsay state-

---

[1] The Supreme Court rendered its *Crawford* opinion after argument in this case. *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). We called for additional briefing based on *Crawford*.

ment unless the hearsay declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant. *Crawford*, 541 U.S. at 68. *Crawford* thus distinguishes between testimonial and nontestimonial out-of-court statements. When testimonial hearsay is at issue, the Sixth Amendment demands unavailability and a prior opportunity for cross-examination. *Crawford*, 541 U.S. at 68. But when the admissibility of nontestimonial hearsay is at issue, the individual states are entitled to determine what statements should be admitted and what statements should be excluded. *Crawford*, 541 U.S. at 68.

¶31 Although the *Crawford* Court declined to provide a comprehensive definition of testimonial statements, it did describe three "formulations of [the] core class" of such statements. 541 U.S. at 51-52. This description is as follows:

> In the first, testimonial statements consist of "ex parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine or similar pretrial statements that declarants would reasonably expect to be used prosecutorially." The second formulation described testimonial statements as consisting of "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions." Finally, the third explained that testimonial statements are those "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."

*Horton v. Allen*, 370 F.3d 75, 84 (1st Cir. 2004) (citations omitted) (quoting *Crawford*, 541 U.S. at 51-52). The Court declined to settle on a single formulation but noted that whatever else the term "testimonial" covers, it applies to "prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations. These are the modern practices with closest kinship to the abuses at which the Confrontation Clause was directed." *Crawford*, 541 U.S. at 68.

¶32 In applying *Crawford,* the Nebraska Supreme Court cited the above excerpt from *Horton* and concluded that a four-year-old child's statements to an emergency room physician did not constitute testimonial statements under *Crawford. State v. Vaught,* 268 Neb. 316, 682 N.W.2d 284, 291 (2004). In *Vaught,* the physician testified that before he examined the child, he asked her what had happened, and she stated that the defendant had sexually assaulted her. The Nebraska court held that the only purpose of the emergency room examination was to provide medical treatment: "There was no indication of a purpose to develop testimony for trial, nor was there an indication of government involvement in the initiation or course of the examination." *Vaught,* 682 N.W.2d at 291. The court concluded that the hearsay did not share any of the characteristics of testimonial statements set forth in *Crawford.*

¶33 Similarly, a Minnesota appellate court held that testimony relating a three-year-old's response when a nurse practitioner asked her if anything had happened was not testimonial hearsay. *State v. Scacchetti,* 690 N.W.2d 393, 396 (Minn. Ct. App. 2005). The court noted that the nurse practitioner sought information to provide a medical diagnosis and was not working on behalf of, or in conjunction with, investigators developing the case against the defendant. *Scacchetti,* 690 N.W.2d at 396.

¶34 The facts in *Vaught* and *Scacchetti* stand in contrast with those in *Snowden v. State,* 156 Md. App. 139, 846 A.2d 36 (2004). In *Snowden,* the Maryland Court of Special Appeals held that statements made by two abused children to a county social worker were testimonial in nature. The children were interviewed for the express purpose of allowing the social worker to testify in their stead under a "tender years" statute that permits certain persons to testify in lieu of a child in sexual abuse cases. The court held that under *Crawford,* Snowden was entitled to a new trial without such testimonial hearsay. *Snowden,* 846 A.2d at 47.

¶35 A California appellate court reached a similar result in *People v. Sisavath*, 118 Cal. App. 4th 1396, 13 Cal. Rptr. 3d 753 (2004). The court found that a videotaped interview with the four-year-old victim at a facility designed for interviewing children suspected of being victims of abuse was testimonial. The interview took place after the complaint and information had been filed and after a preliminary hearing had been held; it was attended by the prosecuting attorney and an investigator from the district attorney's office. Under these facts, there was no question that the child's statements were made under circumstances that would lead an objective witness reasonably to believe that the statements would be available for use at a later trial. *Sisavath*, 13 Cal. Rptr. 3d at 757.

¶36 This case is obviously more similar to *Vaught* and *Scacchetti* than to *Snowden* and *Sisavath*. Here, a family practice physician examined Ty the morning after his admission to the hospital. After talking to his mother, the doctor asked him what had happened. She was not a government employee, and Fisher was not then under suspicion. And the doctor testified that she questioned Ty as part of her efforts to provide him with proper treatment. Here, as in *Vaught* and *Scacchetti*, there was no indication of a purpose to prepare testimony for trial and no government involvement. Nor was the statement given under circumstances in which its use in a prosecution was reasonably foreseeable by an objective observer. Because the hearsay statement was not testimonial, *Crawford* does not apply, and we need examine only its admissibility under the hearsay rules or Washington's child hearsay statute, RCW 9A.44.120.[2]

## ER 803 and RCW 9A.44.120

¶37 Fisher also asserts that Ty's statement was inadmissible under ER 803(a)(4) and RCW 9A.44.120. We first address the evidentiary rule.

---

[2] The State argues that Fisher waived this issue by failing to assert a confrontation clause violation at trial. Even if this were so, on appeal he asserted a Sixth Amendment rights violation below.

■ ¶38 Under ER 803(a)(4), "statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment" are admissible. To be admissible, the declarant's apparent motive must be consistent with receiving treatment, and the statements must be information on which the medical provider reasonably relies to make a diagnosis. *State v. Lopez*, 95 Wn. App. 842, 849, 980 P.2d 224 (1999).

■ ¶39 The circumstances surrounding Klenk's initial interview of Ty indicate that Ty would understand that he was being questioned for purposes of medical treatment. Before Klenk spoke with Ty, he had been transported in an ambulance, x-rayed, scanned, examined, sutured and had received IV therapy. When he spoke with Klenk, he was in a hospital bed in a hospital room where he had spent the night. Given these facts, Ty's statement was made in the context where a declarant knows that his comments relate to medical treatment. Ty's statement was properly admitted through Klenk under ER 803(a)(4).

¶40 Fisher contends, however, that Klenk's question to Ty was for forensic rather than treatment purposes and thus not admissible under ER 803(a)(4). As support, he cites Division Three's refusal to admit hearsay statements made to a forensic interviewer for sexually abused children under ER 803(a)(4) where the State conceded that the interviews were for trial preparation rather than medical diagnosis or treatment. *Lopez*, 95 Wn. App. at 849.

¶41 There is no such concession here. Although Klenk initially testified that her care would not have depended on Ty's answer to her question, she added that a child's abuse disclosure relates to his or her hospital care. She testified that she went to Ty's room to evaluate what additional action to take on his behalf.

¶42 As Division One has stated, "[i]n determining whether an injury is intentional or accidental, to prevent further child abuse, a physician must attempt to get a history from the child and determine whether the history adequately explains the injury." *In re Dependency of S.S.*, 61 Wn. App. 488, 501, 814 P.2d 204 (citing *State v. Butler*, 53 Wn. App. 214, 218-19, 766 P.2d 505 (1989)), *review denied*, 117 Wn.2d 1011 (1991); *see also United States v. Renville*, 779 F.2d 430, 436 (8th Cir. 1985) ("[s]tatements by a child abuse victim to a physician during an examination that the abuser is a member of the victim's immediate household *are* reasonably pertinent to treatment"). Klenk's inquiries were made, not for trial preparation, but to determine the proper course and duration of medical care. The analysis in *Lopez* does not render Ty's statement inadmissible under ER 803(a)(4).

¶43 Finally, Fisher contends that the trial court erred in failing to make a separate determination that Ty was competent at the time of his statement before admitting it under ER 803(a)(4). As support for this contention, he relies on *State v. Karpenski*, 94 Wn. App. 80, 971 P.2d 553 (1999), *overruled by State v. C.J.*, 148 Wn.2d 672, 63 P.3d 765 (2003).

¶44 In *Karpenski*, we held that before admitting a child hearsay statement under RCW 9A.44.120, a trial court must find that the child was competent at the time the statement was made. *Karpenski*, 94 Wn. App. at 112. The admissibility of the child's hearsay statement to a doctor under ER 803 was not at issue in *Karpenski* because no error had been assigned to the statement's admission and no objection had been made at trial. *Karpenski*, 94 Wn. App. at 123. We stated, however, that if a proper objection were made to the doctor's testimony following remand, the trial court should consider the seven-year-old victim's competence when he spoke to the doctor, whether he was aware he was speaking for medical diagnosis and treatment, and "all other circumstances affecting the statement's reliability as of the time it was made." *Karpenski*, 94 Wn. App. at 123.

¶45 Our Supreme Court reversed *Karpenski* in *State v. C.J.*, 148 Wn.2d 672, 684, 63 P.3d 765 (2003), holding that competency at the time of the statement is not a prerequisite to admissibility of child hearsay under RCW 9A.44.120. In so holding, the court noted that the defendant had not appealed the trial court's decision to admit the hearsay evidence under ER 803. *C.J.*, 148 Wn.2d at 678 n.1. Fisher thus argues that *C.J.* is not dispositive because it did not discuss ER 803 and that *Karpenski* requires a finding of competency at the time of the statement before evidence is admissible under the rule. Although Fisher correctly summarizes *Karpenski*, the *C.J.* decision constrains us to reject Fisher's argument.

¶46 The trial court did not err in admitting Ty's hearsay statement under ER 803(a)(4) and in finding that no separate inquiry into his competency at the time of the statement was necessary.[3]

## Spanking Evidence

¶47 Fisher next contends that the trial court erred in allowing the State to cross-examine his character witnesses with evidence that Fisher had spanked Ty.

¶48 At issue here was the admissibility of evidence showing that Fisher had once spanked Ty and that he had written in a letter to Toews that she should "give Ty a spanking for me." 2 RP at 216. The court found such evidence inadmissible in the State's case in chief but admissible to cross-examine the character witnesses who testified to Fisher's reputation for being peaceful and gentle with children.

¶49 We do not disturb a trial court's ruling allowing the cross-examination of character witnesses absent a manifest abuse of discretion. *State v. Styles*, 93 Wn.2d 173, 176-77, 606 P.2d 1233 (1980). A court abuses its discretion

---

[3] The State also argues that Ty's statement was admissible under RCW 9A.44.120. Because we hold that Ty's statement was admissible for other reasons, we do not address this argument.

when it bases its decision on untenable grounds or untenable reasons. *State v. Moran*, 119 Wn. App. 197, 218, 81 P.3d 122 (2003), *review denied*, 151 Wn.2d 1032 (2004). By relating a personal history supportive of good character, a defendant may be opening the door to rebuttal evidence along the same line. *State v. McFadden*, 63 Wn. App. 441, 450 n.25, 820 P.2d 53 (1991), *review denied*, 119 Wn.2d 1002 (1992). And ER 405(a) specifically allows cross-examination into "relevant specific instances of conduct" where a witness offers testimony concerning a person's reputation. The primary purpose of such cross-examination, however, must be to impeach the witness and not to vilify the defendant's character. *Styles*, 93 Wn.2d at 176.

¶50 The limited cross-examination that the trial court allowed on this subject did not serve to vilify Fisher. When one witness testified that Fisher had the reputation for "almost being a teddy bear" around children, with "a very gentle soul that's almost like a pied piper" (3 RP at 404), the State cross-examined him as follows after describing the children involved in this case:

Q:   . . . Now, would your opinion of his character for being gentle to children change if you had seen a letter in which he says: Give the boy a spanking and give the daughter a kiss for me?

A:   Um, no. I think you're stretching it, misinterpretation there. Like I say, I can draw from my own experience on that both ways.

Q:   Simple yes or no? A: No, it would not change at all.

. . . .

Q:   Okay. And what about these circumstances: Are you aware of a fact that as a boyfriend, that when the mom was around, he would spank the child. Would that change your opinion about his gentle nature towards children?

A:   A swat on the diaper? No.

Q:   I'm not saying that.

A.   No.

3 RP at 407-08. When he testified, Fisher explained that his spanking consisted of once swatting Ty on the rear because the child had hit his sister over the head with a toy. The record does not demonstrate that the spanking evidence unduly prejudiced Fisher or that the trial court committed a manifest abuse of discretion by allowing cross-examination of character witnesses on the subject.

## Prosecutorial Misconduct

¶51 Finally, Fisher contends that the trial court erred in denying his motions for a mistrial and a new trial because of prosecutorial misconduct.

¶52 At issue here is the prosecutor's questioning of Toews about whether she asked her son about the cause of his injuries and the prosecutor's references during closing argument to Ty's competency, to Fisher admitting his guilt to Sergeant Nelson, and to Fisher allowing Ty to fall asleep despite his head injuries.

¶53 We give deference to a trial court's ruling on prosecutorial misconduct because it is in the best position to determine if the misconduct prejudiced the defendant's right to a fair trial. *State v. Luvene*, 127 Wn.2d 690, 701, 903 P.2d 960 (1995). The defendant bears the burden of establishing both the impropriety of the prosecutor's conduct and its prejudicial effect. *State v. Brett*, 126 Wn.2d 136, 175, 892 P.2d 29 (1995), *cert. denied*, 516 U.S. 1121 (1996). Prosecutorial misconduct does not constitute prejudicial error unless we determine that there is a substantial likelihood that the misconduct affected the verdict. *Brett*, 126 Wn.2d at 175.

¶54 Fisher contends that the prosecutor committed prejudicial error when he asked Toews whether she questioned Ty, after the child made his disclosure to Klenk, about how he got hurt. The pertinent questions and answers were as follows:

Q:  Okay. Did you have a conversation with Ty separate from Dr. Klenk about the same time when Dr. Klenk wasn't

around? I don't want you to tell me what Ty said, I just want—after Dr. Klenk had that disclosure, was there another time you went in to talk to Ty about that?

[Defense counsel]: Objection, Your Honor. Can we be heard on this?

THE COURT: I'm going to overrule the objection on that question, that did she talk to Ty.

Q: Did you talk to your son separately and try to find out how he was hurt after that?

A: Yeah.

5 RP at 726-27. After the jury recessed, defense counsel again objected to this line of questioning and to the pause that followed Toews's answer. When the court asked whether defense sought relief, counsel replied that Fisher could not afford a mistrial and requested admonishment. When the State could not explain the relevancy of its question to the court's satisfaction, the court explained that the objection was well taken but that no relief was available.

¶55 Fisher fails to show that the trial court abused its discretion in making this decision. Although, as the court ultimately observed, the State came "close to the line" in questioning Toews, the court did not think the question amounted to reversible error. RP (Jan. 4, 2002) at 23-24. The court gave Fisher the remedy he requested, and there is not a substantial likelihood that the State's improper question affected the jury's verdict.

¶56 Fisher next complains about statements that the prosecutor made during closing argument. The prosecutor began his argument with a general reference to the jury's ability to consider the testimony and to assess the witnesses' credibility:

When you look at that, Ty is not competent to come in here and take the stand and explain every little detail of what happened. A two and a half year old. Think about your two and half year old or three and a half year old. How would they do on the stand? They'd be squirming and they wouldn't be able to handle this type of intense cross-examination—

8 RP at 1107. When defense counsel objected, the court instructed the jury to disregard any argument the law and the evidence did not support and to make its decisions based only on the admitted evidence and the court's instructions.

¶57 Fisher argues that these remarks suggested to the jury that Ty could have testified but that the State was protecting him from defense counsel's cross-examination, even though the prosecutor was fully aware that neither party could have put Ty on the stand. Although the prosecutor committed misconduct by referring to the issue of Ty's competency, which was not discussed during trial, the court instructed the jury to disregard argument that the evidence or law did not support, and we presume the jury followed the court's instructions. *State v. Grisby*, 97 Wn.2d 493, 499, 647 P.2d 6 (1982), *cert. denied*, 459 U.S. 1211 (1983). Given the court's ruling, we cannot say that the prosecutor's improper argument prejudiced Fisher's right to a fair trial.

¶58 Fisher next complains about the prosecutor's implication that Fisher confessed to Sergeant Nelson. After discussing Fisher's actions in cleaning up the living room and putting Ty to bed in a darkened room, the prosecutor made the following statements:

> How else does a guilty man act? They say things like, "What are they going to do to me?" Remember that part of Sgt. Nelson's testimony when he has the defendant on tape and boxed in? He says, "What are they going to do to me? Maybe I should just as well admit it."

8 RP at 1139. Defense counsel objected: "That's not the evidence. Talking about Nelson in that context, that's not the evidence." 8 RP at 1139. The court again instructed the jury to disregard any argument the evidence did not support.

¶59 The record shows that Fisher made an apparent admission to Toews and to her mother, but not to Nelson. In ruling on Fisher's motion for a new trial, the court observed

that Fisher's admission thus was in evidence and that Fisher could have clarified its context in his own closing argument. The court did not find the misattribution of the statement significant. We agree.

¶60 Finally, Fisher complains that the prosecutor argued that Ty was asleep when his mother came home, thereby showing that Fisher ignored Toews's instructions to keep him awake and was, in effect, trying to kill the child. Defense counsel made no objection when the prosecutor first advanced this theory and argued that Fisher's actions in putting Ty to bed with a head injury demonstrated his culpability. Rather, counsel countered with the argument that Fisher had tried to keep Ty awake and that he was awake when Toews got home. In rebuttal, the State referred to a written statement Toews made:

> But her written statement says: "I asked him to wake him up and keep him awake." He was asleep. Why would you ask somebody to wake him up? Why would you ask someone to wake him up if he wasn't out? He was out. You don't ask him to wake him up and keep him awake. An order he didn't follow. If you want to hide somebody, you want them to be asleep and you want them to be in the dark so they can't be seen. That's where you hide a child that's been abused.

8 RP at 1246. Defense counsel objected on the basis that nothing in Toews's statement indicated that Ty was asleep. The court overruled the objection.

¶61 During cross-examination, Toews read from her statement that she had asked Fisher "to wake him up and keep him awake until I got home to take him to the hospital." 5 RP at 757-58. On redirect, she reiterated that she had told Fisher to wake Ty up when she spoke with him on the telephone. Thus, the prosecutor's statement that Ty had been asleep at some point following his injury was a logical inference from the evidence and was not improper. *See State v. Stenson*, 132 Wn.2d 668, 727, 940 P.2d 1239 (1997) (prosecutor has wide latitude in closing argument to draw and express reasonable inferences from the evidence), *cert. denied*, 523 U.S. 1008 (1998). The trial court did not

err in denying Fisher's motions for a mistrial and/or a new trial based on prosecutorial misconduct.

¶62 Affirmed.

MORGAN, A.C.J., and HUNT, J., concur.

Reconsideration denied June 7, 2005.

Review denied at 156 Wn.2d 1013 (2006).