**UNITED STATES of America, Plaintiff,**

v.

**Dennis L. SANER and Harold E. Vogel, Defendants.**

**No. IP–03–181–CR–M/F.**

United States District Court, S.D. Indiana, Indianapolis Division.

April 9, 2004.

Frank J. Vondrak, Usdoj Antitrust Division, Chicago, IL.

James R Streicker, Chicago, IL.

***ORDER ON DEFENDANT SANER'S MOTION FOR SEVERANCE AND THE UNITED STATES' MOTION IN LIMINE TO ADMIT DEFENDANT VOGEL'S STATEMENTS AGAINST INTEREST INTO EVIDENCE AGAINST BOTH DEFENDANTS***

McKINNEY, Chief Judge.

This matter comes before the Court on two related motions: Defendant Saner's Motion for Severance and the United States' Motion in Limine to Admit Defendant Vogel's Statements Against Interest Into Evidence Against Both Defendants.

On September 11, 2003, a grand jury indicted Dennis L. Saner ("Saner") and Harold E. Vogel ("Vogel") (collectively "Defendants") for engaging in an antitrust conspiracy in violation of 15 U.S.C. § 1 (the "Sherman Act"). Earlier in 2003, Vogel made a series of statements to Justice Department officials that tend to incriminate both himself and Saner in the antitrust conspiracy. The instant motions require the Court to rule on the admissibility of Vogel's statements against both Defendants.

The Court has fully considered the parties' arguments as set forth in their briefs and, for reasons explained below, the Court DENIES Saner's Motion for Severance and DENIES the United States' Motion to Admit Defendant Vogel's Statements Against Interest into Evidence Against Both Defendants. The admission of Vogel's statements against Saner at the joint trial of Saner and Vogel would violate Saner's rights under the Confrontation Clause of the Sixth Amendment. However, the Government has indicated that it believes that a joint trial of the Defendants is in the interests of justice, and stated that it would agree not to offer the statements in question in its case in chief if the Court were to conclude that they are inadmissible. Thus, despite the Court's conclusion that the statements are inadmissible, severance is unnecessary and the case will proceed against both Defendants.

## I. BACKGROUND

This case involves allegations of anticompetitive conduct by two bookstores that serve the Indiana University Purdue University Indianapolis ("IUPUI") campus. Saner manages a textbook store owned and operated by Follett Higher Education Group, Inc. ("FHEG"), and Vogel is the Director of Bookstores for the textbook stores operated by IUPUI. According to the indictment, Saner and Vogel met to discuss competition between their book stores, and agreed to: (1) eliminate discounts for medical textbooks; and (2) increase the profit margin for *all* new textbooks from 25% to 27%, all in violation of § 1 of the Sherman Act. Indict. at 2.

In the course of the Government's investigation of Saner and Vogel, an Antitrust Division attorney and a paralegal interviewed Vogel at his home. The interview took place at approximately 6:00 p.m. on February 23, 2003. The attorney and the paralegal introduced themselves as Justice Department officials, and asked Vogel if he would speak with them regarding an investigation they were conducting into anticompetitive conduct in the retail sale of textbooks. The interview lasted about an hour.

During the interview, Vogel made a series of statements that tend to inculpate himself and Saner in the antitrust conspiracy:

"Yes [we discussed discounting] as far as him giving the students a discount ... As I recall, I expressed displeasure in that they were offering a discount and we weren't ... I think what we did is we matched to be competitive with their discount."

"I think maybe at some point we decided it wasn't in our best interest to offer discounts. We agreed upon that."

"We did discuss going to [a] 27% [margin] ... [W]e discussed how it would affect each other if one went to 27, the other did or both did ... We had an understanding that we would both consider going to 27 ... "

"[I]s it illegal for 2 managers to talk about pricing?"

"[I]f two people decide to charge the same amount for a product, 2 competitors, is that a conspiracy?"

Gov't Factual Background in Stmt. Against Interest Memo at 2–3. The in-

stant motions concern the admissibility of the above-quoted statements.

## II. *DISCUSSION*

The Government seeks to admit Vogel's statements as substantive evidence against both Defendants. According to the Government, the statements are admissible under the hearsay exception for statements against penal interest because: (1) the statements were against Vogel's penal interests, (2) Vogel will be unavailable to testify at trial (due to his Fifth Amendment right to refuse to testify at his criminal trial), and (3) circumstances corroborate the trustworthiness of the out-of-court statements. FED. R. EVID. 804(b)(3). *See also United States v. Robbins,* 197 F.3d 829, 838 (7th Cir.1999). In addition, citing the standard from *Ohio v. Roberts,* 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), *overruled by Crawford v. Washington,*—U.S.—, — U.S. ——, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the Government asserts that Vogel's statements contain "particularized guarantees of trustworthiness" such that admission of the statements against Saner would not violate his rights under the Confrontation Clause of the Sixth Amendment. In support of his Motion for Severance, Saner argues that the statements do not meet the requirements of FED. R. EVID. 804(b)(3) or the Confrontation Clause, and requests severance of the joint trial or a ruling that the statements are inadmissible at the joint trial of Saner and Vogel.

### A. *CRAWFORD V. WASHINGTON*

Subsequent to the parties' briefing of these motions, the Supreme Court decided *Crawford v. Washington,* — U.S. ——, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), which dramatically altered the landscape for courts considering Confrontation Clause issues like the instant one. Prior to *Crawford, Ohio v. Roberts* and its progeny governed whether or not an un-available accomplice/declarant's pre-trial statements could be used against a co-defendant at their joint trial. In the typical *Ohio v. Roberts* situation, the declarant, whose pre-trial statements inculpated both himself and his co-defendant, would exercise his right not to be a witness against himself under the Fifth Amendment (or the declarant would be otherwise unavailable at trial), prohibiting the co-defendant from exercising his Sixth Amendment right to confront the witnesses against him through cross-examination. The *Ohio v. Roberts* Court held that those types of pre-trial statements could be admitted at trial only when (1) "the evidence falls within a firmly rooted hearsay exception" or (2) they contain "particularized guarantees of trustworthiness" such that adversarial testing of the statements would add little to the statements' reliability. *Roberts,* 448 U.S. at 66, 100 S.Ct. 2531. The Supreme Court subsequently held that "accomplices' confessions that inculpate a criminal defendant are not within a firmly rooted exception to the hearsay rule as that concept has been defined in our Confrontation Clause jurisprudence." *Lilly v. Virginia,* 527 U.S. 116, 135, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999). Thus, prior to *Crawford,* the admissibility of Vogel's statements as substantive evidence against Saner would have turned on whether the statements contained "particularized guarantees of trustworthiness" such that adversarial testing of Vogel's statements would add little to their reliability, and the parties briefed the issue under that standard.

However, the Supreme Court abrogated the *Roberts* test in *Crawford.* In *Crawford,* after the State of Washington charged a husband and wife with murder, the wife made a post-arrest statement to the police that inculpated herself and her husband. *See Crawford,* — U.S. at

————, 124 S.Ct. at 1357–58. The wife, invoking Washington's marital privilege, did not testify at trial, and her statement to the police was admitted against the husband despite a defense objection on the basis of the Sixth Amendment. *See id.* The Supreme Court held that the State's use of the wife's statement violated the Confrontation Clause because "[w]here testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." *See id.* at 1375.

In reaching its decision, the Court traced the history behind the Confrontation Clause, and made two conclusions about the meaning of the Sixth Amendment provision from the history. *See id.* at 1363–66. First, the historical record revealed that "the principal evil at which the Confrontation Clause was directed was the civil-law... use of *ex parte* examinations as evidence against the accused." *Id.* at 1363, 124 S.Ct. 1354. In the 16th and 17th centuries, judicial officials would routinely conduct private examinations of witnesses, and the examinations would be read into evidence against the accused at trial, despite protests by the accused for an opportunity to confront the absent accusers. *See id.* at 1360–61. The First Congress had this questionable practice in mind when it drafted the proposal that eventually became the Sixth Amendment. *See id.* at 1363.

The history behind the Sixth Amendment also supported a second inference: "that the Framers would not have allowed admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford,* —— U.S. at ——, 124 S.Ct. at 1365. The prior-opportunity to cross-examine was a *necessary* condition for the admissibility of testimonial statements against the accused in a criminal case, and the Sixth Amendment incorporates this limitation. *See id.* at 1365–66.

The Court then explained that the legacy of *Roberts,* which often led to the admission of pre-trial testimonial statements based on "indicia of reliability" other than prior cross-examination, clashed with the core meaning of the Sixth Amendment:

The legacy of *Roberts* in other courts vindicates the Framers' wisdom in rejecting a general reliability exception [to the Confrontation Clause]. The framework is so unpredictable that it fails to provide meaningful protection from even core confrontation violations.

Reliability is an amorphous, if not entirely subjective, concept...

The unpardonable vice of the *Roberts* test, however, is not its unpredictability, but its demonstrated capacity to admit core testimonial statements that the Confrontation Clause plainly meant to exclude.

*Crawford,* 124 S.Ct. at 1372. Because the parties relied on *Roberts* and its progeny in their briefs, their arguments are now largely irrelevant. Thus, the Court will determine whether or not Vogel's statements to the Justice Department officials are admissible in light of *Crawford.*

### B. *CRAWFORD'S EFFECT ON THE INSTANT CASE*

Because the *Crawford* holding is limited to "testimonial statements," the Court must determine if Vogel's statements fall into that category. *Crawford,* —— U.S. at ——, 124 S.Ct. at 1375 (*"[w]here testimonial statements are at issue,* the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation.") (emphasis added). If Vogel's statements to the Department of Justice

officials were testimonial, then *Crawford* dictates that the statements are inadmissible at the joint trial of Saner and Vogel because Saner did not have the opportunity to confront Vogel about the statements. If the statements were nontestimonial, then the Court will consider whether or not they can be admitted consistent with the hearsay rules of the Federal Rules of Evidence.[1] Unfortunately, the Supreme Court explicitly declined to spell out a definition of "testimonial." *See id.* at 1375 ("We leave for another day any effort to spell out a comprehensive definition of 'testimonial.'"). However, the Court did provide some guidance on the issue:

> Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to *police interrogations.* These are the modern practices with the closest kinship to the abuses at which the Confrontation Clause was directed.

*Id.* (emphasis added). The Court also explicitly declined to define the scope of the phrase "police interrogations." *See id.* at 1366 n. 4.

Further guidance on the ambit of "testimonial statements" comes from the Court's analysis of the case before it. The Court's initial focus was on the text of the Sixth Amendment, which provides, in relevant part, "In all criminal prosecutions, the accused shall enjoy the right... to be confronted with the witnesses against him..." U.S. CONST. amend. VI. *See Crawford,* — U.S. at ——, 124 S.Ct. at 1365. Witnesses against the accused "bear testimony" against him. *See id.* Thus, the Sixth Amendment guarantees a criminal defendant the right to confront those who "bear

testimony" against him. The Court acknowledged that the word "testimony" is subject to various formulations, and stated:

> Regardless of the precise articulation [of testimony/testimonial statements], some statements qualify under any definition—for example, *ex parte* testimony at a preliminary hearing.

> Statements taken by police officers in the course of interrogations are also testimonial under even a narrow standard. Police interrogations bear a striking resemblance to examinations by justices of the peace in England. The statements are not *sworn* testimony, but the absence of oath was not dispositive.

*Id.* The Court continued, analogizing the prosecutorial and investigative role of modern-day law enforcement officers to the prosecutorial role of magistrates in England:

> That interrogators are police officers rather than magistrates does not change the picture either. Justices of the peace conducting examinations under the Marian statutes were not magistrates as we understand that office today, but had an essentially investigative and prosecutorial function.

> The involvement of government officers in the production of testimonial evidence presents the same risk, whether the officers are police or justices of the peace. In sum, even if the Sixth Amendment is not solely concerned with testimonial hearsay, that is its primary object, and interrogations by law enforcement officers fall squarely within that class.

*Id.* at 1366. In the end, the Court had little difficulty concluding that the wife's statements in response to police question-

---

1. The Court noted that most hearsay exceptions, such as the business records exception and the exception for statements in furtherance of a conspiracy, cover *nontestimonial* statements. *See Crawford,* — U.S. at ——, 124 S.Ct. at 1367. Thus, the *Crawford* holding will not affect the admissibility of statements that qualify for admission under those hearsay exceptions.

ing constituted testimonial statements. *See id.*[2]

The most obvious distinguishing factor between the circumstances in *Crawford* and the present circumstances is that Vogel was not in custody when he made the statements to the prosecutor. However, this does not appear to be a meaningful distinction under *Crawford*. When the Court concluded that interrogation by law enforcement officers constituted testimonial hearsay, it was careful to note that it was using the term "interrogation" in the colloquial sense, not in the narrow, legal sense:

> We use the term "interrogation" in its colloquial, rather than any technical legal, sense. *Cf. Rhode Island v. Innis,* 446 U.S. 291, 300–01, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). Just as various definitions of "testimonial" exist, one can imagine various definitions of "interrogation," and we need not select among them in this case. [The wife's] recorded statement, knowingly given in response to structured police questioning, qualified under any conceivable definition.

*Id.* at 1365 n. 4. In other words, courts should not interpret "interrogation" in this context by the same strict standards that govern the term in the *Miranda* context, where police questioning is not interrogation unless it takes place in a custodial setting. *See Innis,* 446 U.S. at 300, 100 S.Ct. 1682. If the Court wanted to limit *Crawford* to statements given in the custodial setting, it could have simply borrowed the familiar definition of interrogation from the *Miranda* context. Rather than use the *Miranda* definition, the Court specifically stated that the term "interrogation" should not be taken in the technical legal sense, and provided other clear indi-

cations that its holding was a broad one. *See Crawford,* —— U.S. at ——, 124 S.Ct. at 1375 ("Whatever else the term [testimonial] covers, it applies *at a minimum* to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations.") (emphasis added).

The *Crawford* Court's central rationale for concluding that the wife's statements constituted testimonial statements that must be tested by cross-examination was the similarity of the modern practice of police interrogation to the abuses at which the Confrontation Clause was directed. That rationale militates against admission of the statements at issue in the instant case. The *Crawford* Court reasoned that "[p]olice interrogations bear a striking resemblance to examinations by justices of the peace in England" and analogized the role of modern-day investigating police officers to that of justices of the peace in England. *See Crawford,* —— U.S. at ——–——, 124 S.Ct. at 1364–65. The instant case involves questioning by a *prosecutor* rather a police officer, and the role of a modern-day prosecutor probably provides an even closer analogy to the role of the justices of peace in England in the 18th century than the role of an investigating police officer does. Like the justices of peace in England, prosecutors are trained in the law, and charged with the duty of assembling evidence to use against the accused at trial. Indeed, when the Department of Justice prosecutor initiated contact with Vogel at his home on February 23, 2003, there is little doubt that the prosecutor's appearance was generated by a desire to gather evidence against Vogel and other potential defendants to be used at trial. The involvement of the prosecu-

---

**2.** Justice Scalia delivered the Court's opinion in *Crawford,* which six other justices joined. *See id.* at 1356. Chief Justice Rehnquist, who was joined by Justice O'Connor, concurred in the result, but dissented from the Court's decision to overrule *Ohio v. Roberts. See id.* at 1374.

tor in procuring the *ex parte* statement from Vogel "with an eye toward trial" presents the risk of prosecutorial abuse that the Supreme Court highlighted in *Crawford. See Crawford,* —— U.S. at —— n. 7, 124 S.Ct. at 1367 n. 7 ("Involvement of government officers in the production of testimony with an eye toward trial presents unique potential for prosecutorial abuse...").

In response to the prosecutor's questioning, Vogel made *ex parte* statements incriminating himself and Saner, which a paralegal transcribed. The prosecution now seeks to use the statements at trial against both Defendants. In other words, Vogel will "bear testimony" against Saner at his criminal trial, and Saner did not have the prior opportunity to confront him. Vogel's responses to the prosecutor's questions were testimonial statements, and admission of the statements against Saner would violate his Confrontation Clause rights under the Sixth Amendment.

In modern practice, prosecutors work together with other law enforcement officials to build cases against perpetrators of crimes. Under *Crawford,* statements made in response to police interrogation constitute testimonial statements and, where testimonial statements are at issue, confrontation is the only indicium of reliability sufficient to satisfy constitutional demands. If *ex parte* statements made in response to police questioning are testimonial, then *ex parte* statements made by a target in response to a prosecutor's questioning, statements elicited by government questioning "with an eye toward trial," *Crawford,* —— U.S. at —— n. 7, 124 S.Ct. at 1367 n. 7, must also be testimonial statements. Due to Saner's Sixth Amendment right to confront the witnesses against him, Vogel's statements to the Department of Justice officials on February 23, 2003, are inadmissible at the joint trial of Vogel and Saner. The Court **DENIES** the United States' Motion to Admit Defendant Vogel's Statements Against Interest Into Evidence Against Both Defendants.

### III. *CONCLUSION*

For the reasons stated herein, the Court concludes that Vogel's statements are inadmissible at the joint trial of Vogel and Saner. As a consequence, the Court **DENIES** the United States' Motion to Admit Defendant Vogel's Statements Against Interest into Evidence Against Both Defendants. However, the Government has indicated that it would agree not to offer the statements in its case unless Vogel were to testify at trial in a manner inconsistent with the February 23, 2003, statements. Accordingly, severance is unnecessary and the case will proceed against both Defendants. The Court **DENIES** Defendant Saner's Motion for Severance.