**STATE of Minnesota, Appellant,**

v.

**Orlando Manuel BOBADILLA, Respondent.**

No. A03–1891.

Supreme Court of Minnesota.

Feb. 9, 2006.

Mike Hatch, Atty. Gen., John Gallus, Kelly O'Neill Moller, Asst. Attys. Gen., St. Paul, Boyd Beccue, Kandiyohi Cty. Atty., Wilmar, for appellants.

John E. Mack, Mack & Daby, P.A., New London, for respondents.

Victor Vieth, Director, American Prosecutors Research Institute National Child Protection Training Center, Winona, for amicus curiae American Prosecutors Research Institute in Support of Appellant State of Minnesota.

Karen Long, Sexual Violence Justice Institute of Minnesota Coalition Against Sexual Assault, Minneapolis, for amicus curiae Minnesota Coalition Against Sexual Assault in Support of State.

John M. Stuart, State Public Defender, Lawrence Hammerling, Deputy State Public Defender, Sara L. Martin, Asst. State Public Defender, Minneapolis, for amicus curiae Minnesota State Public Defender's Office in Support of Orlando Manuel Bobadilla.

Teresa J. Nelson, American Civil Liberties Union of Minnesota, St. Paul, Howard S. Carp, Volunteer Atty. on behalf of American Civil Liberties Union of Minnesota, Minneapolis, for amicus curiae American Civil Liberties Union of Minnesota.

## OPINION

ANDERSON, RUSSELL A., Chief Justice.

Orlando Manuel Bobadilla was convicted of first-degree criminal sexual conduct and sentenced to 144 months in prison following a jury trial in Kandiyohi County. On appeal, the court of appeals reversed his conviction and remanded for a new trial, concluding that, pursuant to *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the admission at trial of statements by a young child in a risk-assessment interview conducted by a child-protection worker had violated Bobadilla's rights under the Confrontation Clause of the United States Constitution. We conclude that the child's statements were not testimonial in nature, and that Bobadilla was not otherwise deprived of a fair trial. We therefore reverse the court of appeals' decision to remand for a new trial, and reinstate Bobadilla's conviction.

On Friday afternoon, May 2, 2003, 3-year-old T.B. was dropped off by his mother for a weekend visit with his father, who was then residing with several relatives, including T.B.'s uncle, 23-year-old respondent Orlando Bobadilla. T.B.'s mother worked a 3:00 p.m.–11:00 p.m. shift on weekends, and following the end of her shift on Sunday, May 4, 2003, she picked up T.B. sometime after 11:00 p.m.

As T.B.'s mother was readying T.B. for bed and changing his pull-up diaper, she "noticed that his bottom was a little red" and asked him what had happened. He became nervous and started playing with his hair. She told him that she was his mother and that he could tell her anything. T.B. then told her that "his Uncle Orlando had put his finger in his 'booty,'" T.B.'s word for buttocks. T.B.'s mother said "okay," finished changing him, and sent him off to his room. She then phoned T.B.'s father and reported what T.B. had said. After hearing of T.B.'s story, T.B.'s grandmother decided that they should take him to the hospital. As T.B. and his mother were waiting to be picked up to go to the hospital by T.B.'s father and grandmother, T.B.'s mother asked him if he had asked Bobadilla to stop. T.B. indicated that he had, and that Bobadilla had said he was sorry.

T.B.'s parents brought T.B. into the hospital's emergency room where he was examined by an emergency-room physician. After talking to T.B.'s parents, the physician conducted a full-body examination of T.B., and observed an abnormal erythema, or redness, around his rectum. The physician saw no ulcerations or lesions, which would have indicated a chronic problem, and believed the erythema was consistent with what the child had disclosed.

A Willmar Police Department officer was dispatched to the hospital on an assault report. The officer initially met with

the emergency room nurse and then with T.B.'s parents. After doing so, the officer forwarded his report to both the Investigations Unit of the police department and the Kandiyohi County Family Service Department. Over the next several days, a Kandiyohi County child-protection worker from the Family Service Department tried a number of times to contact T.B.'s mother by phone, finally connecting with her on May 9, 2003. The child-protection worker arranged to have T.B. interviewed that day at the law enforcement center.

T.B. and his parents arrived at the law enforcement center at approximately 1:30 p.m. The child-protection worker and a Willmar police detective, out of uniform, met the family and escorted them to the interview room. The interview room, called the "child friendly room," was specifically used for interviewing children and featured a video camera that recorded the exchange from behind a one-way mirror. The detective did not participate in the interview, but observed, sitting across from the child-protection worker and T.B. The child-protection worker conducted the interview using the CornerHouse protocol, which she described as a technique "specifically geared towards interviewing children who have been victims of sexual abuse." The protocol consists of establishing rapport with the child, ascertaining the child's terms for parts of the anatomy, ascertaining whether abuse occurred, and closing with a "safety message". The Corner-House technique instructs the interviewer to ask nonleading questions, to use terms children would understand, and to progress quickly since young children have short attention spans.

The child-protection worker began the interview by asking T.B. about his parents and she then drew pictures of them. Next, using a diagram of a male, she had T.B. identify his names for various parts of the anatomy, starting with the head and moving down. Then the following exchange occurred:

Child–Protection Worker: [H]as anybody hurt your body?

T.B.: Mmm, MmmMmm (affirmative)

CPW: Yeah. Who hurt your body?

T.B.: Orlando did.

CPW: Orlando did * * * How did Orlando hurt your body?

T.B.: He (inaudible) my (inaudible).

CPW: What?

T.B.: He, he (inaudible) touch my (inaudible).

CPW: (inaudible) your bootie. Okay. What did he do to your bootie?

T.B.: (inaudible) put his finger in there.

CPW: He just put his finger in there? Okay * * *.

T.B. then identified what he meant by "booty" by pointing to the buttocks area on the diagram the child-protection worker had provided.

The child-protection worker asked T.B. where he and Bobadilla were at the time of the incident, and T.B. said they were in his father's room. She asked where his father was while it happened. T.B. said that his father had gone downstairs and then come upstairs, but he also said "yeah" when asked if his father had seen it happen. Then the child-protection worker asked him if he would show her what had happened using an anatomically correct doll. He said he would, but ultimately did not. She also asked if Orlando touched him on his skin or on his clothes, and T.B. replied, "My skin." The child-protection worker then closed the interview by telling T.B. that what had happened was not okay, and that he should tell someone, like his mother, if something similar ever happened again.

Bobadilla was charged with first-degree criminal sexual conduct, in violation of Minn.Stat. § 609.342, subd. 1(a) (2004) (engaging in sexual penetration with another person under 13 years of age when the actor is more than 36 months older than the complainant), and second-degree criminal sexual conduct, in violation of Minn. Stat. § 609.343, subd. 1(a) (2004) (engaging in sexual contact with another person under 13 years of age when the actor is more than 36 months older than the complainant).

At trial, the district court found T.B. incompetent to testify, but ruled that his statements to his mother and his statements in the child-protection interview were sufficiently reliable to permit their admission as substantive evidence under the hearsay exception embodied in Minn. Stat. § 595.02, subd. 3 (2004). Therefore, the court allowed T.B.'s mother and the child-protection worker to testify about T.B.'s statements, and also allowed the state to show the videotape of T.B.'s interview. In addition to the evidence of T.B.'s statements, the emergency-room physician testified regarding her medical examination of T.B. T.B.'s father also testified, stating that he left his son alone with Bobadilla for only seconds when he went downstairs to retrieve the family cat, but that he might have told police that he was gone for 5 minutes or so. The detective testified that Bobadilla, in his police interview, said that T.B.'s father was gone for 15–20 minutes looking for the cat. Bobadilla testified on his own behalf and denied the allegations of sexual misconduct.

The jury found Bobadilla guilty as charged. The district court entered judgment of conviction for the first-degree criminal sexual conduct charge and imposed the 144–month presumptive sentencing guidelines term, together with 5 years of conditional release. On appeal, Bobadil-la challenged certain evidentiary rulings and argued that T.B.'s statements in the child-protection interview were testimonial statements and therefore the admission of those statements without a prior opportunity for cross-examination violated his constitutional right of confrontation under the United States Supreme Court's decision in *Crawford*, which had been decided while his appeal was pending. 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177. Though the court of appeals rejected Bobadilla's other arguments, the court agreed that his right of confrontation had been violated, and therefore reversed his conviction and remanded the matter for a new trial. We granted the state's petition for review.

I.

■ The Confrontation Clause of the United States Constitution ensures that a criminal defendant "shall enjoy the right * * * to be confronted with the witnesses against him." U.S. Const. amend. VI; *see also* Minn. Const. Art. 1, § 6. Prior to the United States Supreme Court's decision in *Crawford*, an unavailable witness's out-of-court statement would not violate the Confrontation Clause if the statement fell under a hearsay exception, and if it bore "particularized guarantees of trustworthiness," or "adequate indicia of reliability." *Ohio v. Roberts*, 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980); *see State v. Hansen*, 312 N.W.2d 96, 102 (Minn.1981). The *Crawford* court rejected this approach, concluding that "[r]eliability is an amorphous, if not entirely subjective, concept." 541 U.S. at 63, 124 S.Ct. 1354. The Court explained:

[The Confrontation Clause] commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination. The Clause thus reflects a judgment, not only about the desirability of reliable evidence (a point

on which there could be little dissent), but about how reliability can best be determined.

*Crawford,* 541 U.S. at 61, 124 S.Ct. 1354. Accordingly, *Crawford* explained that the Confrontation Clause should be interpreted as a procedural, rather than a substantive guarantee, aimed at curbing abuses that were inherent in "the civil-law mode of criminal procedure, and particularly its use of *ex parte* examinations as evidence against the accused." *Crawford,* 541 U.S. at 50, 61, 124 S.Ct. 1354. In light of this procedural focus, *Crawford* instructs that the right of confrontation attaches not to judicially determined "reliable" statements, but to all statements by "witnesses against the accused—in other words, those who bear testimony." *Id.* at 51, 124 S.Ct. 1354 (quotation marks omitted). Thus, *Crawford's* Confrontation Clause test bars at trial all "testimonial" out-of-court statements when the accused is not afforded "a prior opportunity to cross-examine" the declarant. *Crawford,* 541 U.S. at 61, 124 S.Ct. 1354. In this case, it is undisputed that T.B. was not subject to cross-examination, and so our sole inquiry under the Confrontation Clause is whether T.B.'s statements in the interview with the child-protection worker were "testimonial" under *Crawford.*

The *Crawford* Court determined that the case before it presented a clearly testimonial situation. *See* 541 U.S. at 53 n. 4, 124 S.Ct. 1354 n. 4. Crawford and his wife were both given *Miranda* warnings and separately interrogated by police officers after Crawford had stabbed a man who had allegedly raped his wife. *Id.* at 38, 124 S.Ct. 1354. Crawford's wife observed the stabbing and her statements describing the incident to the police officers were introduced in her husband's trial under the statements-against-penal-interest exception to the hearsay rule, since her state-

ments tended to show that she had a role in facilitating the assault. *Id.* at 38–40, 124 S.Ct. 1354.

The *Crawford* Court considered the wife's statement—a "recorded statement, knowingly given in response to structured police questioning"—to be clearly testimonial, but "refus[ed] to articulate a comprehensive definition" of testimonial statements. *Id.* at 53 n. 4, 68 n. 10, 124 S.Ct. 1354. The Court listed three formulations of testimonial statements, though it declined to choose among them:

1.  *ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially;

2.  extrajudicial statements contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions;

3.  statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.

*Id.* at 51–52, 124 S.Ct. 1354 (internal citations, quotation marks, and ellipses omitted; numbering added).

Though it is unclear whether any of these three formulations are authoritative, *Crawford* explained that all three "share a common nucleus" of testimonial statements, which includes, "at a minimum * * * prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and * * * police interroga-

tions."[1] *Id.* at 52, 68, 124 S.Ct. 1354. The *Crawford* Court also explained that a testimonial statement "is typically a solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Id.* at 51, 124 S.Ct. 1354 (quotation marks omitted). Therefore, "[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." *Id.* at 51, 124 S.Ct. 1354.

As interpreted by *Crawford,* the Confrontation Clause is aimed at protecting against abuses by both declarants and government questioners. *See Crawford,* 541 U.S. at 44, 56 n. 7, 67, 124 S.Ct. 1354. *Crawford* explains that the Framers wrote the Clause not only in consideration of scheming declarants like the infamous Lord Cobham, who was allowed to present self-serving and uncross-examined testimony in the trial of Sir Walter Raleigh, but also in consideration of corrupt government officials, explaining that "[the Framers] knew that * * * government officers[ ] could not always be trusted to safeguard the rights of the people." *Crawford,* 541 U.S. at 44, 67, 124 S.Ct. 1354. The *Crawford* Court observes that the "[i]nvolvement of government officers in the production of testimony with an eye toward trial presents unique potential for prosecutorial abuse." *Id.* at 56 n. 7, 124 S.Ct. 1354.

We have dealt extensively with testimonial statements under *Crawford* once previously. In *State v. Wright,* we held that a 911 call reporting an assault and a police interview with the assault victims, conducted soon after the incident, were both non-testimonial. 701 N.W.2d 802, 804, 815 (Minn.2005). However, we explained that we would determine whether statements were testimonial on a case-by-case basis, especially given the uncertainty surrounding Confrontation Clause issues following *Crawford. Wright,* 701 N.W.2d at 812. In making the determination that the statements at issue in *Wright* were not testimonial, we articulated eight relevant considerations:

> (1) whether the declarant was a victim or an observer; (2) the declarant's purpose in speaking with the officer (e.g., to obtain assistance); (3) whether it was the police or the declarant who initiated the conversation; (4) the location where the statements were made (e.g., the declarant's home, a squad car, or the police station); (5) the declarant's emotional state when the statements were made; (6) the level of formality and structure of the conversation between the officer and declarant; (7) the officers' purpose in speaking with the declarant (e.g., to secure the scene, determine what happened, or collect evidence); and (8) if and how the statements were recorded.

*Id.* at 812–13. The second and seventh factors—the purpose of the statements from the perspective of the declarant and from the perspective of the government questioner—were the central considerations. *See id.* at 811, 813–14. The other six factors are probative of these two. We believe that *Wright's* focus on the purpose of the statements from the perspectives of both the declarant and the government questioner is consonant with *Crawford's* concern with abuses by both declarants and government questioners.

Our approach in *Wright* is consistent with the approach of numerous other

---

1. The Court acknowledged that various definitions of "interrogations" exist, but declined to clarify further, explaining that there was no need to reach a more precise definition since the facts before it clearly qualified as an interrogation under any possible definition. *Crawford,* 541 U.S. at 53 n. 4, 124 S.Ct. 1354.

courts that have also determined that the testimonial question turns on whether government questioners or declarants take or give a statement "with an eye toward trial." *Crawford,* 541 U.S. at 56 n. 7, 124 S.Ct. 1354. For example, when the facts indicate that both a government questioner and a declarant are, to a substantial degree, acting with an eye toward trial, courts have consistently held that the declarant's statements are testimonial. *See, e.g., United States v. Saner,* 313 F.Supp.2d 896, 901–02 (S.D.Ind.2004) (deciding that incriminating statements made to an investigating prosecutor were testimonial); *People v. Zarazua,* No. H025472, 2004 WL 837914, *4 (Cal.Ct.App. 6th Dist. Apr. 20, 2004) (determining that an adult rape and assault victim's videotaped statement to police at the police station was testimonial); *People v. Vigil,* 104 P.3d 258, 262–63 (Colo.Ct.App.2004) (determining that a statement by a 7–year–old declarant during a police interrogation was testimonial where the child understood the punitive consequences of his statements), *cert.*

*granted,* 2004 WL 2926003 (Colo. Dec.20, 2004); *see also Crawford,* 541 U.S. at 51, 124 S.Ct. 1354 (stating that "[a]n accuser who makes a formal statement to government officers bears testimony"). In the converse situation, when both a questioner and a declarant are not, to any substantial degree, acting with an eye toward trial, courts have consistently held that the declarant's statements are not testimonial, as we did in *Wright.*[2] 701 N.W.2d at 813–14. Most courts have also determined that a statement is testimonial if a government questioner is acting largely for the purpose of preserving a statement for trial, even if the declarant is not. *E.g., United States v. Bordeaux,* 400 F.3d 548, 556 (8th Cir.2005) (deciding that a statement was testimonial when a young child was interviewed for the purpose of collecting information for law enforcement), *reh'g en banc denied* (May 27, 2005); *State v. Mack,* 337 Or. 586, 101 P.3d 349, 352 (2004) (same); *People ex rel. R.A.S.,* 111 P.3d 487, 488 (Colo. Ct.App.2004) (same).[3]

**2.** *See Hammon v. State,* 829 N.E.2d 444, 457–58 (Ind.2005) (deciding that a wife's statements to officers investigating a domestic abuse report were not testimonial where neither the police nor the wife were principally motivated by a desire to preserve the wife's statements for trial); *People v. Griffin,* 33 Cal.4th 536, 15 Cal.Rptr.3d 743, 93 P.3d 344, 372 n. 19 (2004) (determining that a victim's statement to a friend at school indicating that defendant had abused her was not testimonial); *Demons v. State,* 277 Ga. 724, 595 S.E.2d 76, 79–80 (2004) (determining that a victim's statement to a coworker that the defendant had threatened to kill her was not testimonial); *State v. Barnes,* 854 A.2d 208, 211 (Me. 2004) (determining that statements by mother seeking "safety and aid" from police were not testimonial); *People v. Moscat,* 3 Misc.3d 739, 777 N.Y.S.2d 875, 879–80 (N.Y.City Crim.Ct. 2004) (determining that a typical 911–call situation is not testimonial because the declarant is essentially crying out for help, "not contemplating being a 'witness' in future legal proceedings," and that the government is similarly not "in contemplation of pursuing crim-

inal charges against a particular person"); *People v. Garrison,* 109 P.3d 1009, 1011 (Colo. Ct.App.2004) (determining that a murder victim's statements to her manager that the defendant was harassing her were not testimonial), *cert. denied,* 2005 WL 878563 (Colo. Apr.18, 2005); *Herrera–Vega v. State,* 888 So.2d 66, 69 (Fla.Dist.Ct.App.2004) (determining that a child's statements to parents reporting a "touching" were not testimonial), *review denied,* 902 So.2d 790 (Fla.2005). *See also Crawford,* 541 U.S. at 51, 124 S.Ct. 1354, explaining that "a person who makes a casual remark to an acquaintance does not" bear testimony.

**3.** We note that a few courts have at least suggested that the declarant's perspective is the dispositive factor in the testimonial analysis, and that the perspective of the questioner, even a government questioner, is essentially irrelevant. *See, e.g., United States v. Cromer,* 389 F.3d 662, 675 (6th Cir.2004) (deciding a case involving statements made to confidential informants and determining, in dicta, that

■ Often, government questioners and declarants will have multiple purposes. But the fact that a statement is given or taken partially for reasons other than preservation for trial does not preclude a determination that the statement is testimonial. *E.g., Bordeaux,* 400 F.3d at 556 (stating that "*Crawford* does not indicate, and logic does not dictate, that multi-purpose statements cannot be testimonial"). For instance, a police officer will often be acting, to at least some degree, with an eye toward trial, even when responding to an emergency. But where preservation for trial is merely incidental to other purposes, such as assessing and responding to an immediate danger, a statement will not be deemed testimonial. *See, e.g., Hammon,* 829 N.E.2d at 458 (statement was not testimonial where an officer taking a statement "was principally in the process of accomplishing the preliminary tasks of

securing and assessing the scene"). Our decision in *Wright* provides an instructive example. In *Wright,* we acknowledged that officers at the scene were acting at least to some degree with an evidence-gathering purpose, but observed that, nonetheless, the officers' actions were primarily "a response to a call for assistance and preliminary determination of 'what happened' and whether there was immediate danger, rather than an effort to gather evidence for a future trial." *Id.* at 813–14. Thus, producing evidence for trial must be at least a substantial purpose of the statement.[4]

■ These decisions, our own decision in *Wright,* and *Crawford* itself all instruct us that the key to determining whether a statement is testimonial is whether either a declarant or government questioner is acting, to a substantial degree, in order to produce a statement for trial.[5] *See espe-*

"the proper inquiry * * * is whether the declarant intends to bear testimony against the accused"); *United States v. Saget,* 377 F.3d 223, 228–29 (2d Cir.2004) (deciding that statements made to undercover officers were not testimonial, and speculating that "the Court would use the reasonable expectation of the declarant as the anchor of a more concrete definition of testimony"), *cert. denied,* 543 U.S. 1079, 125 S.Ct. 938, 160 L.Ed.2d 821 (2005); *and see generally* Richard D. Friedman, *The Conundrum of Children, Confrontation, and Hearsay,* 65 Law & Contemp. Probs. 243, 251 (Winter 2002) (advocating a declarant-centered approach to Confrontation Clause analysis). However, in *Wright* we rejected an approach that did not consider both the perspective of the government questioner and the perspective of the declarant. *See* 701 N.W.2d at 811–14. We do not think that an approach that makes the declarant's perspective dispositive gives adequate consideration to *Crawford's* fear of governmental abuses. *See* 541 U.S. at 56 n. 7, 67, 124 S.Ct. 1354.

4. The observation that producing a statement for trial must be at least a substantial purpose of a testimonial statement can also be inferred from courts' disparate treatment of similar factual situations. *Compare Lopez v. State,*

888 So.2d 693, 699–700 (Fla.Dist.Ct.App. 2004) (determining that an excited utterance made at the scene of a crime was testimonial where the declarant making the statement to a police officer knew that his statement would be used at trial, explaining that the key was "the purpose for which the statement was made"); *with Hammon,* 829 N.E.2d at 456–58 (determining that an excited utterance made at the scene of a crime was not testimonial where neither the police officer taking the statement nor the declarant were "principally motivated by a desire to preserve the statement" for trial). Similarly, *compare State v. Powers,* 124 Wash.App. 92, 99 P.3d 1262, 1266 (2004) (determining that a 911 call was testimonial where the purpose of the call was mainly to report a crime, not to gain urgent assistance), *with Moscat,* 777 N.Y.S.2d at 879–80 (determining that a 911 call was not testimonial where the declarant's principal purpose was crying out for help, and where the declarant was "not contemplating being a 'witness' in future legal proceedings").

5. Like many *Crawford* issues, it remains a lively question whether the Confrontation Clause is concerned with statements made to government officers only, or with statements

*cially Hammon,* 829 N.E.2d at 456 (concluding that "if either [a declarant or questioner] is principally motivated by a desire to preserve the statement .[for use at a future trial] it is sufficient to render the statement 'testimonial,'" and determining that "development 'with an eye toward trial' is in our view the critical component" of determining whether a statement is testimonial under *Crawford* ).

■ Whether a declarant or government questioner is acting, to a substantial degree, in order to produce a statement for trial is determined by asking whether a reasonable government questioner or declarant in the relevant situation would exhibit that purpose. We make this inquiry, as opposed to an inquiry into the subjective motivations of declarants or questioners, because *Crawford* explained that "only cross-examination" can reveal a declarant's subjective perception of his or her situation. 541 U.S. at 66, 124 S.Ct. 1354. In addition, this approach is consistent with our reasoning in *Wright,* in which we looked to the likely motivations of reasonable people in the relevant situations, *see* 701 N.W.2d at 811, 813–14, but rejected an inquiry that hinged on the perspective of an objectively situated person who was unaffected by the context in which the statement was made, *see id.* at 814. In so doing, we explained that the latter approach would be overbroad, and would improperly ignore statements' "interrogative qualities," or the contextual aspects of the questioning. *Id.* Finally, we note that an

inquiry into the purpose of a reasonable government questioner or declarant in the relevant situation also conforms with *Crawford's* core categories of testimonial statements—"prior testimony at a preliminary hearing, before a grand jury, or at a formal trial; and * * * police interrogations"—since a reasonable questioner taking a statement in any one of those situations would always exhibit a substantial concern with producing a statement for use in legal proceedings. 541 U.S. at 68, 124 S.Ct. 1354.

## II.

In the context of child-declarant cases, courts in several jurisdictions have held that the statements of children in interviews conducted by social workers or police investigators are testimonial. We note that the facts of many of these cases can be distinguished from the present situation. *See, e.g., Snowden,* 846 A.2d at 39–41, 47 (finding the statements of 10– and 8–year–old children to be testimonial when the statements were taken pursuant to a statute that allows the admission at trial of children's out-of-court statements regardless of whether the children are incompetent or unavailable to testify). Moreover, as with other cases in which testimonial questions arise, these cases have consistently determined that children's statements are testimonial in situations where either the declarant or government questioner was acting, to a substantial degree, in order to produce a statement for trial.[6]

---

between any questioners or declarants who are acting "with an eye toward trial." Robert P. Mosteller, *Crawford v. Washington: Encouraging and Ensuring the Confrontation of Witnesses,* 39 U. Rich. L.Rev. 511, 518 (Jan. 2005). In this case, we do not need to address whether statements not involving government officers may be testimonial, and so we express no opinion on this question.

. But it is clear that, at least in some situations, statements taken by non-police-officer government officials could be testimonial. *See Crawford,* 541 U.S. at 66, 124 S.Ct. 1354 (stating that "[t]he Framers would be astounded to learn that *ex parte* testimony could be admitted against a criminal defendant because it was elicited by 'neutral' government officers").

**6.** *See, e.g., Bordeaux,* 400 F.3d at 556 (stating

Using a similar rationale, several courts have considered the statements of children to social workers or police officers to be tantamount to police interrogations, and therefore testimonial. *E.g., T.P. v. State,* 911 So.2d 1117, 1123 (Ala.Crim.App.2004) (stating that "because [an interview of a child by a social worker] was intended to be used as an investigative tool for a potential criminal prosecution, the interview is similar to a police interrogation and, thus, falls within the definition of 'testimonial' contained in *Crawford* "), *cert. denied* (Ala. Mar. 11, 2005). As we noted above, we think it is reasonable to conclude that in any situation tantamount to a "police interrogation" under *Crawford,* the government questioner taking the statement would be acting, to a substantial degree, in order to produce a statement for trial.

■ But in this case, neither the child-protection worker nor the child declarant, T.B., were acting, to a substantial degree, in order to produce a statement for trial. The parties do not dispute that the interview of T.B. was conducted in accord with a statutory scheme for reporting, investigating, and responding to threats to children's health or welfare. Minn.Stat. § 626.556 (2004). This statutory scheme

provides that certain individuals must report the maltreatment of minors either to law enforcement or to the local welfare agency. *Id.* Following a report of abuse, "the local welfare agency shall immediately conduct an assessment including gathering information on the existence of substance abuse and offer protective social services for purposes of preventing further abuses, safeguarding and enhancing the welfare of the abused or neglected minor, and preserving family life whenever possible." Minn.Stat. § 626.556, subd. 10(a). To the extent that an allegation of abuse alleges a violation of a criminal statute, the local welfare agency and law enforcement must "coordinate the planning and execution of their respective investigation and assessment efforts to avoid a duplication of fact-finding efforts and multiple interviews." *Id.* Both the welfare agency and law enforcement must prepare separate reports. *Id.* The local welfare agency is required to use a "nondirective" question-and-answer format and to make audio-video recordings of the interviews of alleged victims of sexual abuse. Minn.Stat. § 626.556, subd. 10(j)(2).

The clearly delineated purpose of this statutory scheme is to protect the health and welfare of children:

that "the purpose of the interview (and by extension, the purpose of the statements) is disputed, but the evidence requires the conclusion that the purpose was to collect information for law enforcement"); *People v. Warner,* 119 Cal.App.4th 331, 14 Cal.Rptr.3d 419, 429 (2004) (holding that a child's statements in an interview with a trained child-interview specialist were testimonial where one of the purposes of the interview was "as an investigative tool for criminal prosecutions"), *rev. granted on other grounds,* 18 Cal.Rptr.3d 869, 97 P.3d 811 (Cal.2004); *In re T.T.,* 351 Ill. App.3d 976, 287 Ill.Dec. 145, 815 N.E.2d 789, 802 (2004) (determining that statements by a child to a family-services interviewer were testimonial where the interviewer was acting "with an eye toward prosecution"); *Mack,* 101 P.3d at 352 (holding that statements

made by a child to a human-services worker were testimonial where the human-services worker "was serving as a proxy for the police"); *Purvis v. State,* 829 N.E.2d 572, 579 (Ind.Ct.App.2005) (holding that statements of a child to an officer were testimonial because "[t]he rationale of the rule in *Crawford* is to exclude from evidence statements that have not been cross-examined that were gathered for the purpose of use at a later trial"). *See also* Mosteller, 39 U. Rich. L.Rev. at 538 (examining post-*Crawford* cases and observing that statements made by children to child-protection workers were determined to be testimonial when the evidence showed that "the government was purposefully creating formalized statements for potential use at trial").

[T]he public policy of this state is to protect children whose health or welfare may be jeopardized through physical abuse, neglect, or sexual abuse. In furtherance of this public policy, it is the intent of the legislature under this section to strengthen the family and make the home, school, and community safe for children by promoting responsible child care in all settings; and to provide, when necessary, a safe temporary or permanent home environment for physically or sexually abused or neglected children.

In addition, it is the policy of this state to require the reporting of neglect, physical or sexual abuse of children in the home, school, and community settings; to provide for the voluntary reporting of abuse or neglect of children; to require the assessment and investigation of the reports; and to provide protective and counseling services in appropriate cases.

Minn. § Stat. 626.556, subd. 1. This statute stands in contrast to statutes such as the Maryland statute at issue in *Snowden,* 156 Md.App. 139, 846 A.2d 36. In *Snowden,* the court found an interview testimonial where the statutory interviewing scheme was designed with the express purpose of facilitating the creation of out-of-court statements for a future trial. *Id.* at 47.

Avoiding multiple interviews is a critical concern when dealing with children not only because the interviews are often traumatic for the child, but also because multiple interviews increase the chance that the children will be confused by unnecessarily suggestive questions. That, by statute,

the initial risk-assessment interview is recorded does not, therefore, necessarily indicate that the purpose of the interview was to create a formalized statement for trial. Given the clear need to limit a child's exposure to stressful and confusing interviews, and the accompanying need to accurately assess risks to the child, there is a compelling need for a single recorded assessment interview solely in order to best protect the health and welfare of the child.[7]

Here, the interview of T.B. was initiated by a child-protection worker in response to a report of sexual abuse for the overriding purpose of assessing whether abuse occurred, and whether steps were therefore needed to protect the health and welfare of the child. In the interview, the child-protection worker established rapport with T.B., identified the child's terms for human anatomy, made a touch and abuse inquiry, and closed the interview. If part of the purpose of this interview was to produce a statement for use at a future trial, such a purpose was at best incidental to the main purpose: assessing and responding to imminent risks to T.B.'s health and welfare. Much like the at-the-scene police questioning in *Wright,* the interview of T.B. "represent[s] a response to a call for assistance and preliminary determination of 'what happened' and whether there was immediate danger, rather than an effort to gather evidence for a future trial." 701 N.W.2d at 813–14. Moreover, given T.B.'s very young age, it is doubtful that he was even capable of understanding that his statements would be used at a trial. As amicus

---

**7.** We also find it somewhat unlikely that *Crawford*'s aim was to discourage the recording of these statements. In fact, "mechanical recording, if done fully and well, may eliminate" concerns of governmental manipulation of witnesses' statements. Mosteller, 39 U. Rich. L.Rev. at 571. Further, "[w]hen statements are accurately recorded in their entirety, then manipulation of what was said is not possible * * * [and] this particular concern is not eliminated—but exacerbated—by the failure to record the statement when it is made." *Id.*

American Prosecutors Research Institute makes clear, children of T.B.'s age are simply unable to understand the legal system and the consequences of statements made during the legal process.

Certainly, communications in initial-assessment interviews may very well evolve into testimonial statements. An interview with an older child who understands the law-enforcement consequences of his statement, or an interview with more significant law-enforcement involvement might both exhibit a greater purpose on the part of a declarant or government questioner to produce statements for use at a future trial. *See, e.g., Vigil,* 104 P.3d at 262–63 (determining that a statement was testimonial where the court indicated that the child understood the punitive consequences of his statements); *R.A.S.,* 111 P.3d at 488, 490 (determining that a child's statement was testimonial where the child was interviewed by an investigating police officer 3 days after an abuse incident). But we conclude that in this case, neither T.B. nor the child-protection worker were acting, to a substantial degree, in order to produce a statement for trial, and therefore T.B.'s statements in the assessment interview were not testimonial.

### III.

■ Bobadilla also challenges certain evidentiary rulings made by the district court. Evidentiary rulings are committed to the trial court's discretion and will not be reversed absent a clear abuse of discretion. *State v. Bjork,* 610 N.W.2d 632, 636 (Minn.2000). And reversal is not warranted unless there is a reasonable doubt that the result would have been different had the evidence not been admitted. *State v.*

*Martin,* 695 N.W.2d 578, 583 (Minn.2005) (citing *State v. Litzau,* 650 N.W.2d 177, 182 (Minn.2002)).

■ First, Bobadilla argues that even aside from Confrontation Clause issues there were not sufficient "indicia of reliability" to admit T.B.'s interview statements. *Hansen,* 312 N.W.2d at 102. A court must consider "the time, content, and circumstances of the statement and the reliability of the person to whom the statement is made" in determining whether there are sufficient indicia of reliability under Minn.Stat. § 595.02, subd. 3.[8] Here, the trial court articulated several sound factors on which it relied in deciding to admit T.B.'s statements. Specifically, the court noted: (1) that the statement was made close in time to the event; (2) that the statement was unusual and consistent with T.B.'s prior reporting; (3) that the questions were not leading or suggestive; and (4) that neither the interviewer nor the detective had any reason to lie. We therefore conclude that the district court did not abuse its discretion by determining that the statements met the statutory requirements of reliability.

■ Second, Bobadilla contends that the testimony of the child-protection worker and the detective concerning the content of the videotaped interview with T.B. was needlessly cumulative under Minn. R. Evid. 403. However, the detective was not permitted to testify about the content of the interview, the child-protection worker's testimony was received without objection, and error, if any, was harmless given that the jury saw the videotape itself.

■ Finally, Bobadilla asserts that the district court committed error by exclud-

---

**8.** "Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law—as does *Roberts,*

and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether." *Crawford,* 541 U.S. at 68, 124 S.Ct. 1354.

ing exculpatory statements contained in his police statements. He argues that his consistent denials of the allegations were admissible as prior consistent statements under Minn. R. Evid. 801(d)(1)(B). The rule requires the speaker to be subject to cross-examination at trial. At the time the court ruled on the state's motion in limine, the cross-examination requirement had not been satisfied. Again error, if any, in the exclusion of the exculpatory statements was harmless, particularly where the jury heard of his consistent denials through the testimony of his brother.

In summary, we hold that statements made by a young child in a risk-assessment interview conducted by a child-protection worker in accordance with the statutory scheme outlined in Minn.Stat. § 626.556 were not testimonial when neither the child nor the child-protection worker were acting, to a substantial degree, in order to produce a statement for trial. We also hold that Bobadilla was not deprived of a fair trial by the district court's evidentiary rulings.

Affirmed in part, reversed in part, and judgment of conviction reinstated.

GILDEA, J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.

PAGE, Justice (dissenting).

I respectfully dissent. The court's conclusion that T.B.'s out-of-court statements were not testimonial and therefore not admitted at trial in violation of Bobadilla's Sixth Amendment right to confront the witnesses against him is error. That conclusion is error because T.B.'s statement was a statement made as part of a police interrogation, in the presence of a police officer, to a government official who was taking the statement as a surrogate interviewer for the police.

In *Crawford v. Washington*, the United States Supreme Court, while not giving guidance as to what constitutes a testimonial statement, stated unequivocally that "[s]tatements taken by police officers in the course of interrogations are also testimonial under even a narrow standard." *Crawford v. Washington*, 541 U.S. 36, 52, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). The *Crawford* Court was also concerned with statements given to government officers: "An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." *Id.* at 51, 124 S.Ct. 1354. This is because government officers "could not always be trusted to safeguard the rights of the people." *Id.* at 44, 67, 124 S.Ct. 1354. Similarly, "[i]nvolvement of government officers in the production of testimony with an eye toward trial presents unique potential for prosecutorial abuse." *Id.* at 56 n. 7, 124 S.Ct. 1354. Moreover, the Supreme Court specifically stated that "interrogations by law enforcement officers fall squarely" within the concerns of the Sixth Amendment and expressed doubt as to the existence of "neutral" government officers. *Id.* at 53, 66, 124 S.Ct. 1354.

According to the record, T.B.'s out-of-court statement was taken as part of an interview set up by a county child-protection worker at the request of a Willmar police detective. The interview took place at the Kandiyohi Law Enforcement Center and was conducted pursuant to Minn.Stat. § 626.556, subd. 10(a) (2004), which requires that, upon receipt of a report of a "violation of a criminal statute involving sexual abuse * * * the local law enforcement agency and local welfare agency shall coordinate the planning and execution of their respective investigation and assess-

ment efforts to avoid a duplication of fact-finding efforts and multiple interviews."[1]

T.B.'s statements generated by the interview fit squarely within *Crawford*'s pronouncement that "[s]tatements taken by police officers in the course of interrogations are also testimonial under even a narrow standard." *Crawford*, 541 U.S. at 52, 124 S.Ct. 1354. With respect to the child-protection worker's involvement, the statements constitute "a formal statement" to a government official and amount to "testimony in a sense that * * * a casual remark to an acquaintance does not." *Id.* at 51, 124 S.Ct. 1354. While it is true that part of the purpose of the child-protection worker in conducting the interview was to assess T.B.'s need for treatment and protection, it cannot be ignored that another equally important purpose was to act as a surrogate interviewer for the corresponding police investigation.

Other courts have found that police involvement in scenarios factually similar to this case gave rise to testimonial statements. *See, e.g., State v. Snowden*, 385 Md. 64, 867 A.2d 314 (2005) (holding statements given by children to a social worker were testimonial when police initiated social worker's participation, requested that the interview take place, were actively involved in the investigation, and the identity of the suspect was known); *see also, e.g., T.P. v. State*, No. CR–03–0574, 2004 WL 2418045 (Ala.Crim.App. Oct. 29, 2004) (holding statements made to child-protection worker while police officer was present were testimonial), *cert. denied* (Mar. 11, 2005); *People v. Sisavath*, 118 Cal.

App.4th 1396, 13 Cal.Rptr.3d 753 (Cal.Ct. App.2004) (holding when interview occurred after prosecution began and prosecutor was present during the interview, statements made to interviewer were testimonial), *review denied* (Sept. 15, 2004); *People v. Warner*, 14 Cal.Rptr.3d 419 (Cal. Ct.App.2004) (determining interview was testimonial when a detective observed and one of the interview's purposes was use as an investigative tool for prosecutions), *petition for review on other grounds granted*, 18 Cal.Rptr.3d 869, 97 P.3d 811 (2004); *Somervell v. State*, 883 So.2d 836 (Fla.Dist. Ct.App.2004) (deciding statement of autistic child given to a police officer at a child advocacy center was testimonial); *In re Rolandis G.*, 352 Ill.App.3d 776, 288 Ill. Dec. 58, 817 N.E.2d 183 (2004) (holding statements made to a child-protection worker while police officer observed through one-way glass were testimonial), *appeal pending* (January Term 2005); *State v. Mack*, 337 Or. 586, 101 P.3d 349 (2004) (holding interview with protective services, arranged by police officers with police officers present, was testimonial).[2] Like many of these cases, the investigation in this case had already started, the police were involved before the interview occurred, the identity of the suspect was known, the police initiated the interview and were involved in coordinating the interview, a police officer was present at the interview, and this was the only interview of T.B. conducted by the police as a result of their effort to comply with Minn.Stat. § 626.556, subd. 10(a). Simply put, the interview here was intended to facilitate

---

1. Under a plain reading of this statutory language, it is clear that the "investigation" referred to is the police investigation and that the "assessment" referred to is the one being conducted by the social welfare agency.

2. But compare cases in which medical personnel, and not government officers or police

officers, were in charge of taking the statement—some of these cases hold that statements to medical professionals are nontestimonial due to the medical purpose of the interview. *See, e.g., State v. Vaught*, 268 Neb. 316, 682 N.W.2d 284 (2004); *State v. Fisher*, 130 Wash.App. 1, 108 P.3d 1262 (2005).

the police investigation. Thus, T.B.'s statement as given to the child-protection worker and the Willmar police detective was per se testimonial under any definition of the term.

Although I conclude that T.B.'s statement was testimonial under any definition of that term, I nonetheless feel compelled to comment on the court's analysis in concluding that the statement was nontestimonial.

As support for its claim that T.B.'s statement was nontestimonial, the court makes an analogy to *State v. Wright*, 701 N.W.2d 802 (Minn.2005). In *Wright*, we concluded that statements made to police officers during on-scene police questioning following a 911 call were nontestimonial. The circumstances leading to the statement in this case are clearly distinguishable from the police questioning in *Wright*. In *Wright*, the police interviews at issue occurred when the police responded to a 911 call placed by the victims of a domestic assault. The victims were interviewed on the scene immediately after the assault occurred. *Id.* at 813. As such, the facts in *Wright* supported a conclusion that the victims' statements were not testimonial because the police were responding "to a call for assistance" and making a "preliminary determination of 'what happened' and whether there was immediate danger, rather than an effort to gather evidence for a future trial." *Id.* at 813–14.

That is not what happened here. Here, while T.B. was examined by a doctor at the hospital on Sunday, May 4, 2003, he was not interviewed by either the police or child-protection personnel until Friday, May 9, 2003, at the law enforcement center. Thus, there was no exigency here as there was in *Wright*. Moreover, because section 626.556, subdivision 10(a), gave the police only one opportunity to question T.B. directly, the questioning had to serve

two functions: preliminary fact-finding and the collection of evidence for a future trial. Because of those distinguishing facts, there is nothing in the *Wright* analysis that causes T.B.'s statement to become nontestimonial.

The court also relies on section 626.556, subdivision 10(a), for support, contending that T.B.'s interview was conducted for the purpose of child protection and that the method chosen was consistent with the legislative intent underlying that section. The court further contends that any law enforcement purpose in participating in the interview was incidental to the child-protection purpose. The record before us belies these contentions. The record is clear that the child-protection worker arranged T.B.'s interview at the request of the Willmar police, that the interview took place at the law enforcement center, that a police detective was present during the interview, and that the interview was conducted to facilitate the police investigation, as well as assess the child's need for protective services.

The court states: "Given the clear need to limit a child's exposure to stressful and confusing interviews, and the accompanying need to accurately assess risks to the child, there is a compelling need for a single recorded assessment interview." But the issue here is not the fact that the interview took place or even the manner in which the interview was conducted. The issue is whether the statements T.B. made during the interview were admissible at trial when T.B. was unavailable to testify and not subject to cross-examination. While the interview here was, in part, conducted for the purpose of protecting the health and welfare of the child, that purpose does not change the fact that the police involvement in requesting and participating in the interview was solely for

the purpose of collecting potential evidence for a future trial.

In its effort to support the conclusion that the purpose of section 626.556 is to protect the health and welfare of the child, the court attempts to distinguish the factually similar Maryland case, *Snowden.* In *Snowden,* a Maryland statute allowed social workers to interview children suspected of having been the victim of sexual abuse and then, under certain circumstances, testify in place of the child using statements obtained during the interview. *Snowden,* 867 A.2d at 321. The *Snowden* court held that these statements were testimonial. *Id.* at 330. The facts of *Snowden* are virtually indistinguishable from the facts in this case. The social worker in *Snowden* became involved in the case only after the police investigation had begun and only at the behest of law enforcement. *Id.* at 326–27. The police were present during the interview, which took place in a "[c]ounty-owned and operated facility unfamiliar to the children and used for the purpose of investigating and assessing victims of child abuse." *Id.* at 327. Similarly, here, the child-protection worker only became involved after she was contacted by a police detective, a police officer was present during the interview, and the interview took place at the law enforcement center, in a child-friendly room unfamiliar to T.B., which was specifically designed for interviewing children alleged to have been abused. The only significant difference between the two statutes is that Minn.Stat. § 626.556, subd. 10(a), does not expressly authorize the admission of the statements obtained during interviews in a subsequent trial.

Thus, while it is true, as the court states, that the express purpose behind the statute in *Snowden* was to prepare testimony for possible use at a future trial, in the end the situation here is not substantially different. Section 626.556, subdivision 10(a), requires that a child sexual abuse victim be interviewed only once and that "the local law enforcement agency and local welfare agency * * * coordinate the planning and execution of their *respective investigation* and assessment efforts to avoid a duplication of fact-finding efforts and multiple interviews." (Emphasis added.) Because of the limitations of section 626.556, subdivision 10, the joint interview of T.B. was law enforcement's only opportunity to develop testimony from T.B. for possible later use at trial. T.B.'s statements were used in court against Bobadilla in the same manner that the statement in *Snowden* was used against that defendant. Here, as in *Snowden,* "[t]he interview questions posed by [the child-protection worker], and the responses elicited, were in every way the functional equivalent of the formal police questioning discussed in *Crawford* as a prime example of what may be considered testimonial." *Snowden,* 867 A.2d at 325. Like the testimonial statements in *Snowden,* T.B.'s statements are also testimonial.

Because the child-protection worker and police detective worked in conjunction with one another and conducted a joint interview of T.B. pursuant to section 626.556, subdivision 10(a), and because T.B. was unavailable at trial and Bobadilla had no opportunity to cross examine T.B., admission of T.B.'s statements at trial constitute a per se violation of Bobadilla's Sixth Amendment rights. While the statute itself is not unconstitutional, the admission of T.B.'s statements obtained pursuant to the statute is unconstitutional.

Finally, the court states that "in this case, neither T.B. nor the child-protection worker were acting, to a substantial degree, in order to produce a statement for trial, and therefore T.B.'s statements in the assessment interview were not testi-

monial." This statement is more than a little troubling in that it assumes that the only government actor involved in T.B.'s interviews was the child-protection worker. That assumption, however, is not supported by the record. The statement wholly ignores the Willmar Police Department's request for and participation in T.B.'s interviews.

In its opinion, the court eloquently articulates the need to, and importance of, protecting children. On the facts of this case, that important need conflicts with the Sixth Amendment, which, under our system of justice, must prevail.

Therefore, I dissent.